COMMONWEALTH vs. TONY A. ANCRUM
(and three companion cases[1]).

No. 05-P-153.

Worcester. October 5, 2005. - March 3, 2006.

Present: PERRETTA, CYPHER, & KANTROWITZ, JJ.

*Firearms. Controlled Substances. Practice, Criminal,* Motion to suppress.
*Search and Seizure,* Automobile, Threshold police inquiry, Reasonable
suspicion, Protective frisk. *Constitutional Law,* Search and seizure, Reason-
able suspicion.

A Superior Court judge erred in allowing the criminal defendants' pretrial mo-
tions to suppress evidence obtained when State troopers, acting on a radio
report of a recent shooting, stopped the motor vehicle in which the
defendants were traveling, where the level of detail in the radio report, the
fact that a violent crime had indeed occurred, and the corroborating details
observed by the troopers and the reasonable inferences drawn therefrom
made it reasonable to infer that the source of the radio report had witnessed
the shooting or had been at the scene and was sufficiently reliable for the
purposes of an investigatory stop of the vehicle [651-654]; similarly, the
troopers were justified, based on their safety concerns, in ordering the
defendants to exit the vehicle [654-655], and their patfrisk of the defendants
and the protective sweep of the vehicle for weapons were within
constitutional limits [655-656].

INDICTMENTS found and returned in the Superior Court Depart-
ment on December 10, 2003.

Pretrial motions to suppress evidence were heard by *Kenneth
J. Fishman,* J.

An application for leave to prosecute an interlocutory appeal
was allowed by *Roderick L. Ireland,* J., in the Supreme Judicial
Court for the county of Suffolk, and the appeal was reported by
him to the Appeals Court.

*Paula Frasso,* Assistant District Attorney, for the
Commonwealth.

[1]Commonwealth *vs.* Giovanni C. Rivera; Commonwealth *vs.* Mitchell Riv-
era; and Commonwealth *vs.* Tyrone C. Strong.

*James G. Reardon, Jr.* (*Leonard J. Staples* with him) for the defendants.

CYPHER, J. Following the indictment of each of the four defendants for multiple firearms violations and for trafficking in cocaine, a Superior Court judge allowed their motions to suppress evidence obtained when State police, acting on a radio report of a shooting in Fitchburg, stopped the car in which they were traveling. A single justice of the Supreme Judicial Court granted the Commonwealth's application for interlocutory appeal and reported the case to this court for determination.[2] For the reasons stated *infra*, we conclude that there was error in the application of legal principles. We therefore reverse the order allowing the motions to suppress.

*Background.* We summarize the motion judge's findings, sometimes supplemented by uncontroverted evidence from the hearing. *Commonwealth* v. *Watson*, 430 Mass. 725, 726 n.5 (2000); *Commonwealth* v. *Ciaramitaro*, 51 Mass. App. Ct. 638, 639 (2001).

A double shooting occurred at 350 Water Street in Fitchburg on September 2, 2003. About twenty minutes later, at approximately 9:00 P.M., State Troopers Christopher Dougherty and James Fitzgerald, on patrol, received a radio dispatch to "be on the lookout" (BOLO) for an automobile. The radio dispatcher stated that the suspect automobile was a "newer model Cadillac, color red with a tan top, described as having long taillights, last seen heading out of the city on Route 12." The dispatcher also indicated that "two black males, [five feet, eight inches], 160 to 170 [pounds], wearing 'do-rag types'[3] on their heads," were seen fleeing the scene of the shooting on foot.

Familiar with the 350 Water Street location, and aware that it was on Route 12, a major thoroughfare leading out of the Fitchburg area, and that it intersected Route 2 in the Fitchburg-Leominster area, the troopers stationed their cruiser on Route 2 eastbound, the most direct route to Boston. Their location was

---

[2]See Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996). See generally *Commonwealth* v. *Ringuette*, 60 Mass. App. Ct. 351, 358-359 & n.3 (2004).

[3]A "do-rag" was described as a bandana-like article, usually made of silk and worn on a person's head.

ten to fifteen miles from the shooting and fifteen to thirty minutes away by automobile, if directly traveled from the Water Street location.

At 9:30 P.M., approximately thirty minutes after they received the radio dispatch, the troopers saw a green Cadillac Eldorado automobile with long, vertical taillights and a tan roof. The troopers followed the Cadillac for three or four miles. The Cadillac was not speeding, and the troopers observed no traffic violations. Using a laptop computer, the troopers checked the Cadillac's registration and learned that it was a 1995 model, registered to a woman in Chelsea, and had not been reported stolen.

The Cadillac, moving in the left travel lane, and apparently observing the police cruiser, braked and moved to the right travel lane. As the troopers pulled alongside the Cadillac, they illuminated its interior using the cruiser's right side "alley light." Trooper Dougherty observed four dark-skinned males, and saw that the driver and the right rear passenger were wearing do-rags. The troopers activated the cruiser's blue lights, and the Cadillac stopped at the roadside.[4]

At this point, the troopers believed there was a strong possibility that the occupants of the vehicle were involved in the recent shooting and that they could be armed. Based on this belief, they conducted a "felony stop."[5] Using the cruiser's public address system, Trooper Fitzgerald ordered the driver to open his window, turn off the engine, and put the car's keys on the roof. Trooper Dougherty stood outside the cruiser with his handgun drawn, using the passenger door to shield himself in case of gunfire. The troopers repeated their commands several times. During this time, Trooper Dougherty observed the rear

---

[4]During this time, there was radio and cellular telephone communication with the Leominster State police dispatcher to report the troopers' observation of the Cadillac and its occupants. Trooper Dougherty questioned whether the original radio dispatch stated the color of the Cadillac was red. Dougherty testified that the Leominster dispatcher called the Fitchburg dispatcher, then notified the troopers that the car was "definitely red." From his training and eleven years of experience, Trooper Dougherty was aware that witnesses sometimes mistake colors.

[5]Trooper Dougherty testified that police implement a "felony stop" when the subjects of the stop are suspected to have been involved in violent crimes, and therefore are treated as armed and dangerous.

passengers looking out the rear window and ducking down repeatedly.

' Several minutes passed while the troopers waited for the driver to respond as instructed. Eventually the driver reached out of the window and placed the keys on the roof of the Cadillac. The troopers ordered the defendants out of the car separately, handcuffed them, conducted a patfrisk of each one, and kept the defendants separated and sitting on the shoulder of the road.[6]

Trooper Dougherty conducted an internal sweep of the Cadillac for weapons. He noticed that the right side of the rear passenger seat was loose and not in place. He saw a Burger King bag in the back seat and noticed that it was warm to the touch. He was aware of two Burger Kings in the area, one in Fitchburg and one in Leominster.

Trooper Dougherty asked the driver, Tony Ancrum, where he had come from. He gave the name of a friend in Shirley, but was unable to state her last name, phone number, or address. Trooper Dougherty asked if he would be able to lead them back to the friend's house and he responded "no." Trooper Dougherty asked if he had gone to a Burger King that day and he said no, but that he thought he had gone to one the day before.

Trooper Dougherty next talked to Giovanni Rivera, the front seat passenger, who also said he had come from a friend's house in Shirley. He, too, was unable to provide her last name, phone number, address, or general directions to her house. He stated that they had gone to a Burger King just before getting on the highway. He also could not describe that area, what it looked like, or the name of the town.

In the meantime, the desk officer at the Leominster State police barracks had run board of probation checks on each of the car's occupants. The troopers learned that among the four men, there were numerous charges, including kidnapping, masked home invasion, and an open drug charge, and that two of the men had prior firearms charges.

After Trooper Cullen arrived at the scene, Trooper Dougherty

---

[6]The patfrisk yielded no weapons other than a folding knife in Tony Ancrum's front pants pocket.

asked him to conduct a more thorough search of the Cadillac for weapons and pointed out the loose and askew rear seat. Trooper Cullen placed his knee on the right side of the seat and felt it move under his weight. He saw that the seat was loose and "bent up" on one side and clearly unattached. As he lifted the unlatched back passenger seat, he discovered two firearms, a Colt .45 handgun and a H & K nine millimeter handgun, and a package with a big ball of a white substance that he believed to be cocaine. After the defendants were given Miranda warnings, they were arrested.

The troopers later obtained a warrant to search the entire car. During that search they discovered a third firearm in the engine compartment.

*Discussion.* a. *Standard of review.* "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). See *Commonwealth* v. *Rogers,* 444 Mass. 234, 235 n.2 (2005), quoting from *Commonwealth* v. *Bottari,* 395 Mass. 777, 780 (1985) ("Although the judge's findings are 'binding in the absence of clear error,' we may reexamine his conclusions of law").

b. *The vehicle stop.* The motion judge concluded that the troopers did not have reasonable suspicion to stop the Cadillac because the Commonwealth did not establish the reliability of the information in the radio broadcast. "A police officer may stop a vehicle in order to conduct a threshold inquiry if he has a reasonable suspicion that the occupants have committed, are committing, or are about to commit a crime. His suspicion must be based on specific, articulable facts and reasonable inferences drawn therefrom." *Commonwealth* v. *Wren,* 391 Mass. 705, 707 (1984). Where the police rely on a radio broadcast to conduct a threshold inquiry, the Commonwealth must demonstrate that the broadcast was based on reliable information. *Commonwealth* v. *Riggieri,* 438 Mass. 613, 615-617 (2003).

Where the broadcast does not appear to be based on a named person, the Commonwealth may compensate for the inability to provide evidence substantiating the informant's reliability and

basis of knowledge with a police officer's corroboration of details in the broadcast. See *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990); *Commonwealth* v. *Walker*, 443 Mass. 867, 872, cert. denied, 126 S. Ct. 662 (2005); *Commonwealth* v. *Barbosa*, 49 Mass. App. Ct. 344, 346 (2000). "Because the standard is reasonable suspicion rather than probable cause, a less rigorous showing [of basis of knowledge and reliability] is permissible." *Commonwealth* v. *Lyons*, *supra* at 19. The standard is objective and is satisfied when "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996), quoting from *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968).

Considering the nature of the information conveyed to the officers in the radio broadcast, it is reasonable to infer that the source of the information was a firsthand witness to the event and not a casual rumor. See *Commonwealth* v. *Barbosa, supra* at 346; Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 4(c)(4) (2004). Furthermore, the troopers were responding to a confirmed report of a recent shooting.[7] Independent police corroboration of a crime is a factor that may be considered when evaluating whether police had reasonable suspicion to make a stop. *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. 550, 554-556 (2002). The information in the radio broadcast was further corroborated by the location of the vehicle, the short period of time that had elapsed, the vehicle's two-toned coloring, the match of one of the two colors, the long taillights, the make of the vehicle, and the fact that two of the vehicle's occupants were black males wearing do-rags.[8] The

---

[7] They were aware from the radio broadcast that there was a victim of the reported shooting. The troopers later learned that there were two victims and one had died.

[8] We agree with the motion judge that corroboration of only the two black males with do-rags or a comparable description would not be sufficient to justify a stop. See *Commonwealth* v. *Cheek*, 413 Mass. 492, 496 (1992) (police corroboration of a broadcast detailing suspect as a black male with a black three-quarter length goose down coat not sufficient to distinguish the defendant, a black male wearing a dark-colored three-quarter length goose down coat, from other males in the predominantly black neighborhood). Here, however, the troopers relied on the detailed description of the vehicle in addi-

troopers were also aware the Cadillac was registered to a woman in Chelsea, and that no woman was in the car.

Thus, from the level of detail in the radio broadcast, the fact that a violent crime had indeed occurred, and the corroborating details observed by the troopers, it is reasonable to infer that the source of the radio broadcast had witnessed the shooting or had been at the scene and was sufficiently reliable for purposes of a *Terry*-type stop. See *Terry* v. *Ohio, supra*; *Commonwealth* v. *Barbosa, supra* at 346 (detailed radio dispatch including information about the event, a description of the robbers and their clothing, the gun used, and the robbers' direction of flight permitted an inference that the informant had witnessed the crime). The observations of the troopers, the reasonable inferences drawn from them, together with the radio broadcast, warranted an investigatory stop of the defendants. Cf. *Commonwealth* v. *Fraser*, 410 Mass. 541, 546 (1991) ("When all the facts are taken together," officer was justified in conducting a protective frisk); *Commonwealth* v. *Mercado*, 422 Mass. at 369-371 (stop and frisk justified based on information officer received and the officer's own observations).

The defendants argue that differences between the information in the radio dispatch and the troopers' observations of the Cadillac and its occupants undermine a conclusion that the officers had reasonable suspicion to stop the Cadillac. The differences in descriptions of the car and the occupants are not significant.[9] It is "inappropriate to assume [that reasonable suspicion] cannot exist absent a full match-up of all parts of the description." *Commonwealth* v. *Emuakpor*, 57 Mass. App. Ct. 192, 198 (2003), quoting from 2 LaFave, Search and Seizure § 3.4(c), at 241 (3d ed. 1996) and 4 LaFave, Search and Seizure § 9.4(g), at 201 (3d ed. 1996). "Police 'must be allowed to take account of the possibility that some descriptive facts sup-

---

tion to the descriptions of the suspects included in the broadcast.

[9]The radio dispatch described the Cadillac as red with a tan top and the troopers stopped a green Cadillac with a tan top. It was described as a "newer model," and the car stopped was a 1995 model. Trooper Dougherty's testimony that the Cadillac had long and vertical taillights was not supported by the turret tape of the radio dispatch. The number of occupants in the Cadillac was four and not two.

plied by victims or witnesses may be in error.' " *Ibid.*[10] See 4 LaFave, Search and Seizure § 9.5(g), at 557 (4th ed. 2004). In their challenge to the troopers' level of reasonable suspicion, we think the defendants have excessively parsed the evidence. See *Commonwealth* v. *Cullen*, 62 Mass. App. Ct. 390, 395 (2004).

Finally, where there may be an "imminent threat" presented "because of shots just fired, . . . there is an edge added to the calculus upon which . . . reasonable suspicion may be determined." *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. at 557 & n.12, and cases cited. "Particularly when a police officer receives information concerning an individual with a gun, the 'test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation.' " *Commonwealth* v. *Stoute*, 422 Mass. 782, 791 (1996), quoting from *United States* v. *Bold*, 19 F.3d 99, 104 (2d Cir. 1994). Contrast *Florida* v. *J.L.*, 529 U.S. 266, 272-273 (2000) (anonymous tip about a gun, standing alone, does not satisfy the reliability requirement for a stop).

The facts known to the troopers here were similar to those known to the police in *Commonwealth* v. *Riggins*, 366 Mass. 81, 83-84 (1974) (two males reported fleeing from a bank robbery scene in a red car heading south on a numbered route were observed by police on a possible connecting route, thirty minutes after the robbery). See *Commonwealth* v. *Barbosa*, 49 Mass. App. Ct. at 346. We conclude the troopers had reasonable suspicion to stop the Cadillac.

c. *The exit order, patfrisk, and search of the Cadillac.* The judge concluded that the stop was not lawful; therefore, he did not consider the actions of the troopers following the stop. However, the judge's findings of fact on this record are sufficient for us to determine whether the officer's actions after the stop were reasonable.[11]

During a motor vehicle stop, the police are justified in order-

---

[10]See the cases cited in *Commonwealth* v. *Emuakpor*, 57 Mass. App. Ct. 192, 197-198 (2003), for examples of differences which have not been considered significant.

[11]In their motion to suppress, defendant Ancrum challenged only the stop;

ing a driver or passengers to leave the car "if they have a reasonable belief that their safety, or the safety of others, is in danger." *Commonwealth* v. *Torres*, 433 Mass. 669, 673 (2001). Here, the police had a reasonable basis to believe that the occupants of the Cadillac had been involved in a recent shooting. In addition, after the Cadillac was stopped, the driver took several minutes to respond to Trooper Dougherty's command that he turn off the engine and place the keys on the roof of the car. These factors, along with the fact that the passengers looked out of the rear window and ducked down, support the exit order. Compare the conduct described in the cases cited in *Commonwealth* v. *Torres*, *supra* at 674. "[It] does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999). Police are entitled to take reasonable precautions for their safety when approaching a stopped vehicle, and may order the occupants to leave the vehicle, pat frisk them, and conduct a sweep for weapons. See *Commonwealth* v. *Vesna San*, 63 Mass. App. Ct. 189, 193-194 (2005), and cases cited. See also *Commonwealth* v. *Santiago*, 53 Mass. App. Ct. 567, 570-571 (2002).

We also conclude that the patfrisk of the defendants and the protective sweep of the vehicle for weapons were within constitutional limits. "[I]n appropriate circumstances, a *Terry* type of search may extend into the interior of an automobile so long as it is limited in scope to a protective end." *Commonwealth* v. *Silva*, 366 Mass. 402, 408 (1974).

The more thorough search of the Cadillac was permissible based on the automobile exception. *Commonwealth* v. *Cast*, 407 Mass. 891, 901 (1990) (automobile exception to the warrant requirement applies "when police have probable cause to believe that a motor vehicle on a public way contains contraband or evidence of a crime"). When Trooper Cullen began the search of the vehicle, the desk officer had run board of probation

---

defendant Giovanni Rivera challenged the stop and the exit order; defendant Mitchell Rivera challenged the stop, the exit order, and the search of the vehicle; defendant Tyrone Strong challenged the stop and the later search of the vehicle pursuant to a warrant.

checks and notified the troopers of the defendants' lengthy and serious criminal records, including two of the defendants' prior firearms related charges. See *Commonwealth* v. *Dellinger*, 10 Mass. App. Ct. 549, 559 (1980) (defendants' lengthy and serious criminal records may be considered by police officer in making an on-the-scene determination of probable cause). The troopers had questioned the defendants and received implausibly vague responses about where they had been prior to getting on the highway and inconsistent responses about when they had been to Burger King. See *Commonwealth* v. *Riggins*, 366 Mass. at 88 ("Implausible answers to police questions will, with other facts, support a finding of probable cause to conduct a search"). Furthermore, Trooper Cullen, aware of places often used to hide contraband, noticed the rear seat was askew and immediately suspected evidence of a crime was stored under the seat. See *Commonwealth* v. *Cast*, *supra* at 900, quoting from *Commonwealth* v. *Myers*, 16 Mass. App. Ct. 554, 557 (1983) ("[o]bservations taking on special significance 'to the trained eye of the officer,' may be relied upon by an officer in making his or her assessment of the existence of probable cause"). This information, coupled with the similarities between the descriptions of the defendants and the vehicle and what the officers had heard in the radio broadcast, established probable cause to conduct the warrantless search of the vehicle based on their reasonable belief that the vehicle's occupants had been involved in the Fitchburg shooting.[12]

> *Order allowing motions to*
> *suppress reversed.*

---

[12]Our conclusion that the initial stop of the vehicle was proper resolves the claim of defendant Tyrone Strong that the later search of the vehicle pursuant to a warrant was invalid as the "fruit of the poisonous tree." See *Wong Sun* v. *United States*, 371 U.S. 471, 487-488 (1963). See also *Commonwealth* v. *Moses*, 408 Mass. 136, 144-145 (1990).