COMMONWEALTH *vs.* DARYL G. CAMPBELL.

No. 05-P-1702.

Plymouth. February 12, 2007. - May 31, 2007.

Present: LENK, GRASSO, & GRAINGER, JJ.

*Firearms. Practice, Criminal,* Motion to suppress. *Constitutional Law,* Investigatory stop. *Search and Seizure,* Motor vehicle. *Practice, Criminal,* Instructions to jury.

At the trial of criminal complaints charging the defendant with carrying a firearm without a license and possession of a firearm without a firearm identification card, evidence from an investigatory stop of the defendant's motor vehicle was admissible, where police officers had reasonable suspicion to stop the defendant's vehicle based on telephone calls from one or more anonymous informants that provided a level of detail sufficient to indicate that the caller or callers had observed events as they unfolded and supplied articulable and specific information linking the defendant in that particular vehicle to both public handling of a firearm and leaving the area where gunshots had been heard. [214-217]

No error resulting in a substantial risk of a miscarriage of justice arose from a supplemental jury instruction at a criminal trial. [217]

COMPLAINTS received and sworn to in the Brockton Division of the District Court Department on January 20, 2004.

A pretrial motion to suppress evidence was heard by *James F.X. Dinneen*, J., and the cases were tried before *James Sullivan*, J.

*Paul C. Brennan* for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

GRAINGER, J. The defendant was charged with carrying a firearm without a license in violation of G. L. c. 269, § 10(*c*), and possession of a firearm without a firearm identification card in violation of G. L. c. 269, § 10(*h*).[1] After a jury trial in Brockton District Court, the defendant was convicted of both charges. The issues on appeal are whether the denial of the defendant's

---

[1] The defendant was charged with other crimes on which the Commonwealth filed a nolle prosequi. See note 3, *infra*.

motion to suppress the firearm was proper and whether a supplemental jury instruction created error. We affirm.

*Facts on motion to suppress.* The judge found the following facts[2] after an evidentiary hearing on the motion to suppress. On January 17, 2004, around 2:00 A.M., two Brockton police department cruisers, one marked and one unmarked, responded to a series of radio dispatches that were, in turn, based on telephone calls from one or more informants. The calls relayed the information that (1) a black male wearing a black coat had a gun at Roman's Bar in Brockton; (2) thereafter the man with the gun was in a Honda motor vehicle with an identified license plate number, heading away from the bar; (3) gunshots were heard around the vicinity of Roman's Bar; and (4) the area in which these activities were reported to have occurred was a high crime area. In response to these dispatches, Detectives Almeida and Delahoy activated the blue lights and sirens on their unmarked patrol cruiser and headed toward Roman's Bar. Officer Gaucher, in a marked cruiser, did the same.

As Detectives Almeida and Delahoy approached the area in which Roman's Bar is located, Almeida saw a black car with the reported license plate number, albeit a Grand Prix and not a Honda. The Grand Prix was behind five or six other cars stopped at a red light. Delahoy, having driven the unmarked cruiser just past the Grand Prix, circled back and came to a stop next to it. It is undisputed that the cruiser at first pulled so close to the vehicle that the doors between the two cars could not be opened. The cruiser then repositioned itself, still next to the suspect vehicle. Almeida made eye contact with the back seat occupants of the vehicle, four in number, who began to move furtively, bending down and popping back up several times. Both officers then stepped out of their cruiser; Almeida positioned himself behind the Grand Prix, where he was able to observe the occupants through the right rear passenger window and rear window.

Officer Gaucher arrived on the scene around this time in a marked cruiser, also with blue lights and sirens on, and pulled up behind the Grand Prix. At this point none of the officers had

---

[2] We have supplemented the judge's findings with uncontested evidence from the motion hearing. See *Commonwealth* v. *Costa*, 448 Mass. 510, 512 n.3 (2007).

spoken to the occupants of the vehicle or directed them in any way.

With the officers so positioned, the passenger in the Grand Prix sitting nearest to the right rear door (later identified as the defendant) opened that door about half way and bent out of the car. Almeida then heard a metallic thud which he identified as steel hitting the pavement. He drew his gun and ordered everyone in the vehicle to show their hands. The officers retrieved a firearm from under the right side of the car. The defendant was then escorted to the police cruiser, where he was read his Miranda rights. He made statements denying that the gun belonged to him and acknowledged that he did not have a license to carry a gun. Drugs were subsequently found in the Grand Prix after a search.[3]

*Discussion.* 1. *Motion to suppress.* "In reviewing the denial of a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error," *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990), but we "conduct an independent review of his ultimate findings and conclusions of law." *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). "Our duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004) quoting from *Commonwealth* v. *Mercado,* 422 Mass. 367, 369 (1996). The question presented is whether the police had reasonable suspicion to stop the Grand Prix at the time that the stop occurred. See, e.g., *Commonwealth* v. *Costa,* 448 Mass. 510, 514 (2007). We affirm the denial of the defendant's motion to suppress, but for a reason other than that articulated by the motion judge.

The judge determined that the "stop" of the vehicle did not occur until after the defendant had discarded the gun and "Almeida yelled at the occupants of the car to stay in the car and keep their hands in view." We disagree that this was the moment the stop occurred. Although the forward motion of the car was impeded by other traffic stopped at a red light and not by the police, the judge found in this case that "both police cars

---

[3]The drugs were suppressed pursuant to the motion to suppress. The Commonwealth elected not to pursue the drug charges. See note 1, *supra.*

had arrived in the area with emergency lights and sirens in operation." The Supreme Judicial Court has held that the activation of lights and sirens is sufficiently confrontational to constitute a stop. *Commonwealth* v. *Smigliano,* 427 Mass. 490, 491-492 (1998) ("a reasonable person, on the activation of a police car's blue lights, would believe that he or she is not free to leave. . . . Activating the blue lights thus was a seizure requiring some level of justification").

In this case, however, we are faced with a variation, namely the fact that the lights and sirens had been activated before the cruisers were in any proximity to the Grand Prix. Thus, under our decisional law, the initial appearance of a cruiser with lights and sirens already activated does not necessarily send a message to stop to one particular car within a general traffic pattern. However, even if what happened here could initially be construed as a use of lights and sirens consistent with a police response to an emergency call somewhere else, it soon became clear that the focus was on the Grand Prix in question. After passing the defendant's Grand Prix, Delahoy circled back and stopped next to it; indeed the cruiser was so close to the car that Almeida, intending to investigate, could not open the door of the cruiser. Delahoy then repositioned the cruiser, still alongside the vehicle, so that Almeida could open his door. By this time Almeida had made eye contact with the car's back seat occupants and then placed himself behind the car. Delahoy also got out of the cruiser, and Gaucher had pulled up behind the Grand Prix in a marked cruiser, also with blue lights and sirens on. Given these circumstances — with one cruiser to the side of the car, another behind it, and the lights and sirens of the cruisers still activated — a reasonable person would not believe that he or she was free to leave. We conclude, under these facts, that a stop had occurred before the defendant opened the door of the car and dropped the gun onto the pavement. We turn, therefore, to examine the justification for the stop.

In assessing an investigatory stop based on an anonymous tip, "our evaluation of the tip's indicia of reliability will be focused on the informant's reliability and his or her basis of knowledge." *Commonwealth* v. *Costa, supra* at 514, quoting from *Commonwealth* v. *Lyons,* 409 Mass. 16, 18-19 (1990). Because the in-

formant was relaying firsthand information, the "basis of knowledge" requirement is satisfied. *Commonwealth* v. *Costa, supra* at 515. We therefore evaluate the reliability of the source of the information.

Massachusetts law places greater reliability on an informant whose identity is known to police or who is identifiable and therefore places his anonymity at risk. See *id.* at 515-516. On this record, there is no evidence to support an inference that the caller or callers were known or identifiable to the police by means of caller identification, voice recording, or other method. Compare *id.* at 517. Nevertheless, the Commonwealth may compensate for the inability to provide evidence substantiating the informant's reliability (and basis of knowledge) with police corroboration of details in the broadcast. See *Commonwealth* v. *Lyons, supra* at 19; *Commonwealth* v. *Costa, supra* at 515; *Commonwealth* v. *Ancrum,* 65 Mass. App. Ct. 647, 651-652 (2006). Based upon the judge's findings, we conclude that the level of detail provided by the callers and the corroborating details observed by the police justified an investigatory stop of the Grand Prix. See *ibid.*

The calls to the police portrayed an immediate danger to public safety. A man was seen to have a gun in a bar. Shortly thereafter, gunshots were heard in the vicinity. Whether viewed as a report of a crime reasonably inferred to have been provided by a firsthand witness, see *id.* at 652, or an imminent danger to public safety, see *Commonwealth* v. *Hurd,* 29 Mass. App. Ct. 929, 930 (1990), such circumstances warranted immediate police investigation. "[T]here is a consistent theme in the gun cases and that is, if the police reasonably perceive danger to themselves or to members of the public, they have a duty to investigate . . . ." *Commonwealth* v. *Foster,* 48 Mass. App. Ct. 671, 673 (2000). The calls provided a level of detail sufficient to indicate that the callers observed events as they unfolded and supplied articulable and specific information linking the defendant in this particular car to both public handling of a firearm and leaving the area where gunshots had been heard. *Commonwealth* v. *Ancrum, supra* at 653. The area in question was known to the police for numerous past gunshot incidents, as well as drug sales and prostitution. The police arrived on the scene within minutes after the call and observed in close

proximity a vehicle similar in type and exactly matching the color and license plate number of the vehicle in which the man with the gun was reported to have left Roman's bar. See *ibid.*

"In determining whether an officer acts reasonably in initiating a threshold, or investigatory, stop, we view the circumstances as a whole, . . . and consider the 'specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience.' " *Commonwealth* v. *Stoute*, 422 Mass. 782, 790 (1996), quoting from *Terry* v. *Ohio*, 392 U.S. 1, 27 (1968). "Particularly when a police officer receives information concerning an individual with a gun, the 'test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation.' " *Commonwealth* v *Stoute, supra* at 791, quoting from *United States* v. *Bold*, 19 F.3d 99, 104 (2d Cir. 1994). In the circumstances of this case, more was not reasonably required of the police to conduct an investigatory stop. See *Commonwealth* v. *Ancrum, supra.* Contrast *Commonwealth* v. *Barros*, 435 Mass. 171, 177 (2001), citing *Commonwealth* v. *Couture*, 407 Mass. 178, 183, cert. denied, 498 U.S. 951 (1990) ("An anonymous tip that someone is carrying a gun does not, without more, constitute reasonable suspicion to conduct a stop and frisk of that individual").

2. *Jury instructions.* The defendant asserts that a supplemental jury instruction, provided in response to a question asked by the jury on the issue of possession, was error and created a substantial risk of a miscarriage of justice. We do not agree. The judge defined possession as having the firearm under one's control without repeating the earlier complete charge that included reference to the intent to exercise control. The judge is not required on such an occasion to "repeat all aspects of his prior charge." *Commonwealth* v. *Sellon*, 380 Mass. 220, 234 (1980). See *Commonwealth* v. *Peters*, 372 Mass. 319, 324 (1977) ("the law does not require repetition of the same thought at each turn"). The jury are presumed to have followed all the instructions given to them. *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1977).

*Judgments affirmed.*