## COMMONWEALTH *vs.* ALFREDO PEREZ, JR.

No. 10-P-1084.

Plymouth. July 12, 2011. - August 29, 2011.

Present: MILLS, GREEN, & KATZMANN, JJ.

*Firearms. Constitutional Law,* Search and seizure, Investigatory stop, Reasonable suspicion, Confrontation of witnesses, Harmless error, Right to bear arms. *Search and Seizure,* Threshold police inquiry, Reasonable suspicion. *Threshold Police Inquiry. Evidence,* Firearm, Ballistician's certificate. *Practice, Criminal,* Motion to suppress, Confrontation of witnesses, Harmless error. *Error, Harmless.*

A District Court judge properly denied the criminal defendant's pretrial motion to suppress evidence discovered by police during an investigatory stop of the vehicle in which the defendant was a passenger, where the police had reasonable suspicion in making the stop, in that it was based on information provided in two 911 telephone calls and relayed by the dispatchers who had received the calls, the basis of knowledge test was satisfied with respect to both callers, and the calculus was informed by the imminent threat posed by gunshots in a residential neighborhood and other analytic factors. [272-279]

At the trial of a criminal complaint charging the defendant with carrying a firearm without a license, in violation of G. L. c. 269, § 10(*a*), the admission in evidence of a certificate of ballistics analysis, without opportunity to cross-examine the analyst who created it, in violation of the defendant's constitutional right to confront witnesses against him, was not harmless beyond a reasonable doubt, where the Commonwealth did not present sufficient evidence to nullify the erroneous admission of the certificate. [279-281]

There was no merit to the criminal defendant's claim that his conviction of carrying a firearm without a license, in violation of G. L. c. 269, § 10(*a*), must be reversed because the statute is a general prohibition against the possession of firearms, absent an applicable exception, and thus violates the Second Amendment to the United States Constitution, where the Second Amendment does not protect people in the circumstances of the defendant, who was in possession of the firearm outside his home; and where there was no evidence that the defendant had ever applied for a license to carry the firearm or that, having been denied a license, he had appealed that decision. [281-282]

COMPLAINT received and sworn to in the Brockton Division of the District Court Department on December 31, 2007.

A pretrial motion to suppress evidence was heard by *David G. Nagle*, J., and the case was tried before *James F.X. Dinneen*, J.

*Sarah G.J. Clymer* for the defendant.

*Christine M. Kiggen*, Assistant District Attorney, for the Commonwealth.

KATZMANN, J. After a jury trial in District Court, the defendant was convicted of carrying a firearm without a license in violation of G. L. c. 269, § 10(a). He now appeals, raising three issues. He claims that the motion judge erred in denying his motion to suppress evidence; that the admission of a certificate of ballistics analysis (ballistics certificate), in violation of his constitutional right of confrontation, was not harmless beyond a reasonable doubt; and that his conviction was in violation of the Second Amendment to the United States Constitution. We determine that the admission of the ballistics certificate was prejudicial error requiring a new trial. We are unpersuaded by the defendant's other claims.

*Discussion.* 1. *Motion to suppress.* Prior to trial, the defendant filed a motion to suppress evidence, contending that the investigatory stop of the motor vehicle in which he was a passenger was not based on reasonable suspicion. After hearing the testimony of Brockton police Officer Kathy DaSilva and Lieutenant Robert Sergio, the motion judge found that there was reasonable suspicion based on the following:

> "Brockton Police Officer Kathy DaSilva testified . . . that on December 30, 2007 at approximately 2:40 A.M. she . . . received a dispatch to respond to 17 Wilmington Street in Brockton for reports of gun shots being fired. Officer DaSilva arrived on scene within minutes. As she was preparing to search the area for casings she received a second dispatch that a caller had reported seeing a dark blue or green motor vehicle leaving the scene after hearing the shots being fired. The caller supplied the dispatch with a registration number MA9122W. She then received a report from Lieutenant Sergio, the shift commander, that he had spotted the motor vehicle with that license plate. He advised the officers of his location. Officer DaSilva and other cruisers joined Lieutenant Sergio who had been

following the motor vehicle. Lieutenant Sergio then executed a stop of the motor vehicle. . . .

"Lieutenant Robert Sergio . . . heard the report of the gun shots fired at 17 Wilmington Street. Wilmington Street runs between Main Street and Montello Street. After this dispatch he headed toward Montello Street because he believed that someone fleeing in a motor vehicle would head in that direction. At that time he heard a second broadcast stating that a dark green or blue motor vehicle with license plate number 9122WY left the scene after hearing the shots. At that time he observed a motor vehicle coming south on Montello Street matching that description. This was a short distance from Wilmington Street. Lieutenant Sergio followed the motor vehicle and observed the license plate to be that in the broadcast 9122WY. He then confirmed with dispatch the plate number. He then notified the other cruisers and continued to follow this motor vehicle. He eventually was joined by the other cruisers at which time he activated his emergency lights and pulled the vehicle over. Because of the nature of the call (gunshots) he ordered all occupants out of the motor vehicle. He kept his hand on his sidearm although he never took his gun out of the holster. The defendants were pat frisked for officer safety. No contraband was found on these individuals. . . . When Lieutenant Sergio found out that a gun was located in the motor vehicle he gave each individual a Miranda warning. The defendant acknowledged he understood same. Lieutenant Sergio asked the group whose gun it was. The defendant replied that it was his gun and that he did not have a license to carry. The defendant was then arrested."

On appeal, the defendant argues that the motion judge erred in denying his motion to suppress because the traffic stop was not supported by reasonable suspicion as set forth in *Terry* v. *Ohio*, 392 U.S. 1, 30 (1968). "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002).

The "reasonableness of official suspicion must be measured by what the officers knew before they conducted their [stop]." *Commonwealth* v. *Barros*, 435 Mass. 171, 176 (2001), quoting from *Florida* v. *J.L.*, 529 U.S. 266, 271 (2000). A police officer may form a reasonable suspicion "based on specific, articulable facts and reasonable inferences therefrom." *Commonwealth* v. *Alvarado*, 423 Mass. 266, 268 (1996). See Smith, Criminal Practice & Procedure § 5.11 (3d ed. 2007). The knowledge of one officer is part of "the collective information" of other officers engaged in the same cooperative effort. *Commonwealth* v. *Gullick*, 386 Mass. 278, 283 (1982). See *Commonwealth* v. *Andrews*, 34 Mass. App. Ct. 324, 327 (1993) (applying collective knowledge doctrine to determination of reasonable suspicion justifying investigatory stop). "When, as here, a police radio broadcast directs officers to make an investigatory stop of a motor vehicle, the stop is lawful only if the Commonwealth establishes both the indicia of reliability of the transmitted information and the particularity of the description of the motor vehicle." *Commonwealth* v. *Lopes*, 455 Mass. 147, 155 (2009). To establish particularity, "the Commonwealth must show that the description provided sufficient detail to allow the police officer relying on the [dispatch] reasonably to suspect that a motor vehicle matching the description was occupied by a person or persons who committed the crime under investigation." *Id.* at 157. The defendant concedes, as he must, that the license plate number and general description of the vehicle[1] establish particularity. See *ibid.* (to establish particularity, "description need not be as singular as a registration plate number").

"To establish that the transmitted information bears adequate indicia of reliability, the Commonwealth must show the basis of knowledge of the source of the information (the basis of knowledge test) and the underlying circumstances demonstrating that the source of the information was credible or the information reliable (veracity test). Because the standard is reasonable suspicion

---

[1] The second caller reported that the vehicle was dark green or blue, while DaSilva's police report indicated that the vehicle was black. "Reasonable suspicion does not require a full match-up of all parts of the description. Police must be allowed to take account of the possibility that some descriptive facts supplied by victims or witnesses may be in error." *Commonwealth* v. *Lopes*, 455 Mass. at 158-159 (quotations and citations omitted).

rather than probable cause, a less rigorous showing in each of these areas is permissible. Independent police corroboration may make up for deficiencies in one or both of the factors." *Id.* at 155-156 (citations and quotations omitted).

Here, the police made the investigatory stop based on information provided in two 911 telephone calls and relayed by the dispatchers who had received the calls. Neither the recordings of the 911 calls themselves nor the recordings of the police dispatches based on these calls were played at the hearing on the motion to suppress. Contrast *Commonwealth* v. *Mubdi,* 456 Mass. 385, 387 (2010) (recording of police dispatch played at hearing); *Commonwealth* v. *Depina,* 456 Mass. 238, 243 (2010) (recording of 911 call was reviewed by motion judge). See generally *Commonwealth* v. *Gomes,* 458 Mass. 1017, 1018 n.5 (2010) ("The Commonwealth would be well advised in the future to make reasonable efforts to introduce [the 911 telephone call recording]"). Thus, our assessment of the basis of knowledge for the two callers is based on the officers' testimony about the information that they received from dispatch. See *Commonwealth* v. *Mubdi,* 456 Mass. at 396.

The basis of knowledge test was satisfied with respect to both the first caller and the second caller. The officers testified that according to the dispatches they received, the first caller heard shots and the second caller observed the vehicle leaving the scene just after the gunshots. Firsthand observations would satisfy the basis of knowledge test. See *ibid.* While a 911 recording would likely have provided more information about the gunshots, a dispatch of a 911 call that gunshots had been heard at 17 Wilmington Avenue supports the inference that the report was based on personal knowledge or perception.[2] See *Commonwealth* v. *Ancrum,* 65 Mass. App. Ct. 647, 652 (2006);

---

[2] "By failing to introduce the 911 call in evidence, the Commonwealth has made difficult what otherwise might have been a straightforward assessment of the caller's source of information." *Commonwealth* v. *Mubdi,* 456 Mass. at 396. We note that in *Mubdi,* the court reviewed a dispatch relaying a 911 call reporting "[o]bserved money and an object being passed, believed to be a firearm." *Id.* at 387. The court determined that it "ultimately [could] not confirm the caller's basis of knowledge without knowing more about what was said during the call." *Id.* at 396. The court was concerned with uncertainty over the caller's formation of the conclusion that what she saw was a firearm. In contrast to an observation that a firearm has been passed, an auditory report

*Commonwealth* v. *Campbell*, 69 Mass. App. Ct. 212, 216 (2007). Indeed, as discussed below, when the police returned to 17 Wilmington Avenue and spoke with the initial caller, she stated that she had heard the gunshots. With respect to the second caller, her auditory perception was also buttressed by the specificity of information she relayed, reporting a license plate number that was later confirmed by the police. Thus, "it is reasonable to infer that the source of the information was a firsthand witness to the event and not a casual rumor." *Commonwealth* v. *Ancrum*, 65 Mass. App. Ct. at 652.

"As to the veracity test, our case law assigns greater reliability to an eyewitness whose identity is known to police than to one who is anonymous." *Commonwealth* v. *Depina*, 456 Mass. at 243. "We have also suggested that the reliability of citizen informants who are identifiable, but may not have been identified, is deserving of greater consideration than that of truly anonymous sources." *Commonwealth* v. *Costa*, 448 Mass. 510, 515 (2007).

> " '[A] tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action. . . .' Some of those features might include '[i]nstant caller identification,' '[v]oice recording of telephone tips [that might] be used by police to locate the caller,' and 'the ability of the police to trace the identity of anonymous telephone informants.' "

*Id.* at 516-517, quoting from *Florida* v. *J.L.*, 529 U.S. at 275-276 (Kennedy, J., concurring). Where a caller is identifiable, and thus is subject to a charge of filing a false report as a consequence of providing false information to law enforcement, a court can consider this factor in assessing the reliability of the tip. *Commonwealth* v. *Mubdi*, 456 Mass. at 397.

Both of the 911 callers here were anonymous. While the second caller was never identified, after the investigatory stop

___

of gunshots does not require the same level of understanding or skill in interpreting the event. Moreover, while any observation is susceptible to inquiry, there is a direct, unmediated link between gunshots and a contemporaneous report of those gunshots.

police officers returned to the scene and spoke to the first caller. The motion judge found that "[t]he initial caller was identified. She stated she only heard shots. The second caller could not be identified." The fact that the officers went back to the scene and spoke with the initial caller supports a reasonable inference that they were able to do so because the caller either had identified herself or could be traced by means of caller identification. While the record would have been better developed had the 911 recording been introduced or the dispatch described in greater detail, cf. *Commonwealth* v. *Costa*, 448 Mass. at 517 (caller "provid[ed] information to the police after knowing that her call was being recorded, and that the number she was calling from had been identified"), we conclude that the first caller was identifiable and thus placed her anonymity sufficiently at risk such that her reliability should have been accorded greater weight than that of an anonymous informant. By contrast, although the police testified that dispatch attempted to contact the second caller by telephone "a couple of times," this was not sufficient to make the second caller identifiable in the absence of any additional facts in the record to indicate or support the inference that the caller knew the call was being recorded or that the caller's number was identifiable. See *Florida* v. *J.L.*, 529 U.S. at 276; *Commonwealth* v. *Mubdi*, 456 Mass. at 397, quoting from *Commonwealth* v. *Gomes*, 75 Mass. App. Ct. 791, 794-795 (2009), *S.C.*, 458 Mass. 1017 (2010) ("Without the 911 call being offered in evidence, we cannot 'conclude that the caller placed his anonymity at risk or was otherwise reliable' ").

"[W]here the source is anonymous, the Commonwealth may still be able to demonstrate reliability by showing that the details of the information provided were corroborated by police observation or investigation." *Commonwealth* v. *Depina*, 456 Mass. at 244. In the case at bar, the police officer observed a vehicle with the exact license plate number reported by the second caller a short distance from the scene of the shooting. This constitutes corroboration. Contrast *ibid.* ("the details the anonymous caller provided were so general" that police corroboration of those details did not bolster caller's reliability). However, here, corroboration of the license plate number amounts to the corroboration of an "innocent fact" and thus does not

alone support the reliability of the second caller. See *Commonwealth* v. *Mubdi*, 456 Mass. at 397; *Commonwealth* v. *Gomes*, 458 Mass. at 1019.

In this case, in assessing reasonable suspicion, we may also consider the "imminent threat" posed by gunshots fired in a residential neighborhood. See *Commonwealth* v. *Mubdi*, 456 Mass. at 398 (and cases cited). See also *Commonwealth* v. *Depina*, 456 Mass. at 246-247 ("[t]he gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion calculus"; in addition, where basis of knowledge and veracity were established such that police could rely on dispatch, other factors could be considered in determining whether police had reasonable suspicion to stop defendant). "[W]here [as here] the gun presents an imminent threat because of shots just fired . . . there is an edge added to the calculus upon which . . . reasonable suspicion may be determined." *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. 550, 557 (2002). See *Commonwealth* v. *Ancrum*, 65 Mass. App. Ct. at 654 (determination of reasonable suspicion included need for prompt investigation of "imminent threat" presented by report immediately following shooting); *Commonwealth* v. *Campbell*, 69 Mass. App. Ct. at 216-217 (test for reasonable suspicion properly considered immediate danger to public safety presented by reports of shots just fired and man carrying gun).[3] Contrast *Commonwealth* v. *Mubdi*, 456 Mass. at 398 (no "imminent threat" where gunshots fired in area the previous night); *Commonwealth* v. *Gomes*, 458 Mass. at 1019 (no "imminent threat" where "no evidence that the gun had been fired, pointed at another person, or otherwise handled in a way that posed a threat to someone, nor was there evidence that the defendant was a dangerous person"). See generally Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 4.3[d][1] (2010).

Besides the "danger to public safety," "[p]hysical proximity" and "closeness in time" are supplemental circumstances that can be considered in determining whether there was reason-

---

[3]We note that *Doocey* and *Campbell* were cited by the Supreme Judicial Court in *Commonwealth* v. *Mubdi* and *Commonwealth* v. *Depina*, and that *Ancrum* was cited in *Commonwealth* v. *Mubdi*.

able suspicion. *Commonwealth* v. *Depina*, 456 Mass. at 246-247. The presence of additional "analytic factors" is "pertinent to resolution of the question of whether a particular investigatory stop meets constitutional measure." *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. at 554. Some of the relevant analytic factors are "(3) the physical proximity between the place of the reported criminal activity and the place of the investigatory stop; (4) the length of time between the reported criminal activity and the investigatory stop, as well as the temporal setting within which the criminal event occurs (for example, in the very late night or very early morning hours); . . . [and] (7) the geographic boundaries where the suspect may reasonably be expected to be found." *Id.* at 555-556 (footnote omitted). Here, the gunshots occurred at 2:40 A.M., the officer who conducted the stop passed only one other vehicle on a street with "extremely light traffic" before coming to the defendant's vehicle on a road that someone leaving the scene would be anticipated to travel, and only a few minutes elapsed between the first dispatch call about the gunshots and the locating of the defendant's vehicle.

In sum, where the first caller was identifiable and veracity thus supported; where the basis of knowledge prong was satisfied for the first and second callers; and where the calculus is informed by the imminent threat posed by gunshots in a residential neighborhood and the presence of additional analytic factors, we conclude that there was reasonable suspicion to justify the search, and we affirm the judge's denial of the motion to suppress. See *Commonwealth* v. *Campbell*, 69 Mass. App. Ct. at 216-217. See also *Commonwealth* v. *Depina*, 456 Mass. at 247.

2. *Ballistics certificate.* After the investigatory stop (discussed *supra*), police found a gun under the driver's seat, one spent shell casing in the rear driver's-side door, and two more spent shell casings on the floor of the back seat. The defendant, who was seated in the rear behind the driver's seat, admitted that the gun belonged to him and that he did not have a license for it. The defendant was arrested and charged with carrying a firearm without a license in violation of G. L. c. 269, § 10(*a*).

In order to convict the defendant of carrying a firearm without a license, the Commonwealth was required to prove that the

gun was a "firearm" as defined by G. L. c. 140, § 121.[4] At trial, the Commonwealth introduced a ballistics certificate to establish the operability element of this definition.[5] Both parties agree that the ballistics certificate was admitted in error under *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527 (2009). The defendant did not object to the admission of the certificate below. However, at the time of trial, such an objection would have been futile. *Commonwealth* v. *Vasquez,* 456 Mass. 350, 352 (2010). We thus are required to determine whether the admission of the certificate was harmless beyond a reasonable doubt. *Ibid.* "[T]o establish harmlessness beyond a reasonable doubt, the Commonwealth must show that other properly admitted evidence of guilt is overwhelming, in the sense that it is so powerful as to nullify any effect that the improperly admitted evidence might have had on the fact finder or the findings." *Id.* at 362 (quotations omitted).

The Commonwealth argues that this case is analogous to *Commonwealth* v. *Mendes,* 75 Mass. App. Ct. 390, 397 (2009), where we stated, "The strength of the independent evidence of the operability of the handgun shows beyond a reasonable doubt the harmlessness of the admission of the certificate. That independent evidence included testimony of three audible shots, the three empty casings, and the smell of gunpowder." We disagree. In *Mendes,* a police officer on the scene heard three gunshots. *Id.* at 391. Here, there were two anonymous 911 calls reporting an unspecified number of gunshots. In *Mendes,* officers responding to the initial report located the firearm within sixty seconds. *Id.* at 392. The gun "smelled as if it had recently been fired" and contained three spent casings, the precise number of shots that the officer reported hearing. *Ibid.* Here, a vehicle observed at the scene was found within minutes, and a firearm was discovered inside the vehicle shortly after that. However,

[4]General Laws c. 140, § 121, as amended by St. 1998, c. 180, § 8, defines a firearm as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured."

[5]On appeal, the defendant only challenged operability. As such, we need not consider whether any of the other elements of the "firearm" definition were satisfied. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

the officers did not report any evidence to indicate that the gun had been recently fired. Moreover, there was no evidence of a connection between the firearm and the shell casings other than their proximity. Thus, we cannot say that the Commonwealth presented sufficient evidence to nullify the erroneous admission of the ballistics certificate.[6] See *Commonwealth* v. *Muniz,* 456 Mass. 166, 172 (2010); *Commonwealth* v. *Rivera,* 76 Mass. App. Ct. 304, 307-309 (2010); *Commonwealth* v. *McCollum,* 79 Mass. App. Ct. 239, 249 (2011). Contrast *Commonwealth* v. *Depina,* 456 Mass. at 250; *Commonwealth* v. *Pittman,* 76 Mass. App. Ct. 905, 906-907 (2010); *Commonwealth* v. *Barbosa,* 77 Mass. App. Ct. 340, 345-347 (2010), further appellate review granted, 458 Mass. 1112 (2011). We therefore remand for a new trial on the charge of carrying a firearm without a license in violation of G. L. c. 269, § 10(*a*).

3. *Second Amendment.* Citing *District of Columbia* v. *Heller,* 554 U.S. 570 (2008) (*Heller*), and *McDonald* v. *Chicago,* 130 S. Ct. 3020 (2010) (*McDonald*), the defendant argues that his conviction under G. L. c. 269, § 10(*a*),[7] must be reversed because the statute, per *Commonwealth* v. *Jones,* 372 Mass. 403, 405-406 (1977), is a general prohibition against the possession of

---

[6]Defense counsel did concede the issue of operability in his closing argument. Since this concession was made only after the erroneous admission of the ballistics certificate, we do not consider this in analyzing the question of harmlessness "lest we compound the prejudicial effect of the certificate['s] admission." *Commonwealth* v. *Mendes,* 78 Mass. App. Ct. 474, 481 (2010), further appellate review granted, 459 Mass. 1104 (2011).

[7]The relevant portion of G. L. c. 269, § 10(*a*), states:

"Whoever, except as provided or exempted by statute, knowingly has in his possession; or knowingly has under his control in a vehicle; a firearm, loaded or unloaded, as defined in section one hundred and twenty-one of chapter one hundred and forty without either:

"(1) being present in or on his residence or place of business; or

"(2) having in effect a license to carry firearms issued under section one hundred and thirty-one of chapter one hundred and forty;

". . .

"shall be punished by imprisonment in the state prison for not less than two and one-half years nor more than five years, or for not less than 18 months nor more than two and one-half years in a jail or house of correction."

firearms, absent an applicable exception, and thus violates the Second Amendment to the United States Constitution. "Because the Second Amendment issue now presented by the defendant was not available to him until after *McDonald* was decided, which was . . . after his trial, we conclude that this failure to raise the issue during his trial does not preclude him from raising it here." *Commonwealth* v. *Powell*, 459 Mass. 572, 587 (2011).

In *Heller*, the United States Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. Two years later the Supreme Court in *McDonald* extended the holding in *Heller* by concluding that "the Second Amendment . . . right to possess a handgun in the home for the purpose of self-defense . . . applies equally to the Federal Government and the States." *McDonald*, 130 S. Ct. at 3050. See *Commonwealth* v. *Powell*, 459 Mass. at 589-591 (discussing *Heller* and *McDonald*).

The Second Amendment does not protect the defendant in this case because he was in possession of the firearm outside his home.[8] *Commonwealth* v. *McCollum*, 79 Mass. App. Ct. at 258. "Moreover, *Heller* and *McDonald* both expressly affirm the Commonwealth's right to regulate in this area with, inter alia, appropriate licensing requirements." *Ibid.* Finally, we note that there is no evidence here that the defendant ever applied for a G. L. c. 140, § 131, license to carry a firearm or that, having been denied a license, he appealed that decision. *Commonwealth* v. *Powell*, 459 Mass. at 590. "[The defendant] chose instead . . . to violate the law. In these circumstances, we conclude that the defendant may not challenge his convictions under G. L. c. 269, § 10(*a*)." *Ibid.*

4. *Conclusion.* The judgment is reversed, the verdict is set aside, and the matter is remanded to the District Court for further proceedings.

*So ordered.*

---

[8]We note that G. L. c. 269, § 10(*a*), does not require an individual to have a license in order to lawfully possess a firearm in his or her residence. See note 7, *supra.*