NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-501                                              Appeals Court


COMMONWEALTH  vs.  JARRIS CHARLEY.


No. 16-P-501.

Suffolk.     February 14, 2017. - March 24, 2017.

Present:  Green, Meade, & Agnes, JJ.


Arrest.  Probable Cause.  Search and Seizure, Arrest, Probable
     cause.  Constitutional Law, Arrest, Probable cause, Search
     and seizure.



Indictments found and returned in the Superior Court
Department on March 2, 2015.

A pretrial motion to suppress evidence was heard by Kenneth
W. Salinger, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Geraldine S. Hines, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by her to the Appeals Court.


Zachary Hillman, Assistant District Attorney, for the
Commonwealth.
Anne Rousseve, Committee for Public Counsel Services, for
the defendant.


GREEN, J.  After hearing a police radio dispatch report of

a robbery and shooting at a nearby convenience store, Boston

police Officer Monica Quinonez observed the defendant walking toward her from the general direction of the convenience store, sweating profusely on a cool November evening. The defendant's build and clothing fit the general description included in the dispatch. Suspecting that the defendant may have been involved in the convenience store incident, Quinonez watched the defendant's movements for a few minutes, then went to the convenience store to view surveillance video of the robbery and shooting. Her observations of the video corroborated her suspicion that the defendant had committed the crime; as a result, several police units were dispatched to the address where Quinonez had last seen the defendant. When police officers approached that address, just under an hour after the robbery and shooting, the defendant came down from the front porch to meet them. Informed that there had been "an incident up the street," the defendant said, "I had nothing to do with the shooting." The officers took him into custody and transported him to the police station, where he was interviewed. After developing additional inculpatory evidence, the police placed him under arrest. A judge of the Superior Court allowed the defendant's motion to suppress evidence[1] obtained after the

---

[1] The defendant also filed a motion to suppress statements, which the judge denied as moot because the statements had been suppressed as "fruit of the poisonous tree" pursuant to the motion to suppress evidence.

police took him into custody, and the Commonwealth appealed.[2]  We reverse.

Background.  We summarize the subsidiary findings of fact entered by the motion judge, which we accept absent clear error, reserving for independent review his ultimate findings and his conclusions of law.  See Commonwealth v. Anderson, 461 Mass. 616, 619 (2012).

On November 4, 2014, at 7:29 P.M., Boston police received a 911 call reporting an armed robbery, in which one person was shot, at a convenience store in the Dorchester section of Boston, known as Savin Hill.  Based on information furnished in the call, the police dispatcher broadcast a report of a robbery and shooting at that location, in which the suspect was a black male wearing a dark colored hoodie with some kind of print or pattern on it, and blue jeans.  In response to the dispatch, a number of officers responded to the convenience store within one-half hour.

Surveillance video at the convenience store showed that the robber was masked and had the hood of his sweatshirt up, so that little of his face was visible.  Details of the robber's clothing, and of his "slim build," observed on the surveillance

---

[2] A single justice of the Supreme Judicial Court allowed the Commonwealth's request for leave to pursue an interlocutory appeal.  See Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996).

video were included in police broadcasts from and after approximately 7:50 P.M.

Boston police Officer Monica Quinonez was working that evening on a police detail at a construction site approximately four blocks away from the convenience store. At approximately 8:00 P.M., Quinonez noticed the defendant walking toward her from the general direction of the convenience store. The defendant was wearing a blue zip-up hooded sweatshirt and blue jeans, consistent with the clothing described in the initial broadcast dispatch.[3] The defendant and Quinonez made eye contact, and Quinonez noticed that the defendant was sweating profusely, even though it was a cool November evening. Recognizing the defendant's resemblance to the general characteristics included in the broadcast dispatch, Quinonez watched the defendant's movements as he got into the front passenger seat of a Toyota sedan, and as he shortly thereafter emerged from the Toyota and went into an apartment building.

Quinonez then walked briskly to the convenience store where the robbery and shooting had occurred, arriving there at approximately 8:15 P.M. Quinonez asked to see the store surveillance video to see whether the robber looked like the man

---

[3] The defendant was not, however, wearing two other items of clothing described in the later broadcasts, after police viewed the store surveillance video: a puffy vest and an orange baseball cap.

she had just seen (the defendant).  After viewing the video and recognizing the similarity of the robber to the defendant, Quinonez told Boston police Sergeant Detective Keith Webb that she had just seen a man who looked like the robber.[4]  In response, three officers, including Officer Jason Ezekiel, a member of the youth violence strike force, traveled in an unmarked cruiser to the address that Quinonez had provided to look for the defendant, and Quinonez walked back there with additional officers.

The cruiser reached the address at approximately 8:30 P.M. The defendant was sitting on the front porch of the apartment building, and the officers watched him from within the cruiser for a brief time before getting out of the cruiser and walking toward the building.  Although the officers were in plain clothes, Ezekiel's shirt had a legend saying "Boston Police," and he wore his police badge on a lanyard around his neck; their status as police officers was obvious to the defendant.  As the officers approached, the defendant stood up and walked toward them, meeting them on the sidewalk.  As he approached the officers, the defendant asked, "What did I do?  Why are you stopping me?"  Ezekiel described the defendant's demeanor as

---

[4] Although the robber wore a mask and had the hood of his sweatshirt pulled up and cinched tightly, Quinonez was able to see his clothing, build, and skin color.  Because the video was in color, Quinonez was able to see and recognize not only the color but also the hue of the robber's clothing.

"confrontational." Ezekiel responded that there had been "an incident up the street." Ezekiel asked the defendant if he lived at that address, and the defendant responded that he was homeless, but that his aunt lived on the third floor there.[5] Ezekiel conducted a patfrisk of the defendant, and then asked the defendant what was in his backpack; in response the defendant said only his work clothes were in the backpack, and began pulling clothes out of the backpack and throwing them on the ground. The defendant again asked why the police were stopping him and said, "I had nothing to do with the shooting." That statement sparked Ezekiel's suspicion, as neither he nor any of the other officers had said anything about a shooting at the "incident up the street." When Ezekiel remarked to the defendant that he had not mentioned anything about a shooting, the defendant became more agitated, and Ezekiel asked him to sit on the front porch of the apartment building.

As the defendant sat on the porch, additional officers arrived. One of them, Boston police Sergeant Hynes, called Lieutenant Detective Hopkins for instructions. Hopkins instructed Hynes to bring the defendant to the police station for questioning. The defendant then was transported to the police station in the back seat of a marked police cruiser.

---

[5] Later, during questioning at the police station, the defendant explained that he occasionally stayed overnight in his aunt's apartment.

At the station, the defendant was taken to an interview room, where (after being advised of his Miranda rights and signing a waiver form) the defendant was interviewed by Boston police Detectives Doogan and Thompson. The defendant cooperated during the interview and, as it neared its end, Doogan told the defendant he would arrange for a ride to take him back to his aunt's apartment. As Doogan left the interview room, however, he saw a frame from the surveillance video frozen on a computer monitor, depicting two distinctive light colored stains on the top of the hood of the sweatshirt worn by the person who robbed the convenience store. Doogan returned to the interview room and asked the defendant to remove his sweatshirt so that he could test it for gunshot residue. Doogan then took the sweatshirt to the computer and compared the stains on its hood to those shown on the surveillance video. Satisfied that they matched, Doogan returned to the interview room, resumed the interview, and asked the defendant why his sweatshirt appeared in the surveillance video. He then placed the defendant under arrest.

Police thereafter secured the third-floor apartment while they obtained a search warrant and, after obtaining the warrant the next day, searched the apartment and recovered additional

evidence.[6]  Twelve days later, police sought and obtained a warrant to search the defendant's backpack; in it they found fifteen twenty dollar bills (most of them sequentially numbered), four ten dollar bills, five five dollar bills, thirty-four one dollar bills, and some articles of clothing.

Discussion.  We agree with the motion judge that the patfrisk of the defendant on the sidewalk in front of the apartment building was supported by reasonable suspicion.  The defendant fit the general description broadcast in the police dispatch in terms of his clothing, build, and skin color.  Quinonez noticed that he was sweating profusely as he walked toward her from the general direction of the shooting and robbery, suggesting that he either had been running, or was nervous and agitated, or both.  Moreover, the defendant's similarity to the general description included in the broadcast dispatch was corroborated in more refined detail when Quinonez observed the color surveillance video and was able to compare directly her visual observations on the video with the man she had just seen.[7]  The fact that he was coming from the direction

---

[6] Police also recovered an orange baseball cap from the roof of the building next door, and a black mask from a grassy strip located between the buildings.

[7] Although Quinonez did not return to the apartment building until after Ezekiel pat frisked the defendant, her recognition of the similarities between the defendant's appearance and the images of the robber appearing in the surveillance video is

of a recent robbery, in which a person had been shot, coupled with the resemblance of his appearance to that captured on the surveillance video, suggested the reasonable possibilities that he was the person who had robbed the convenience store and that he might be armed and therefore could pose a risk to the officers. See Commonwealth v. Narcisse, 457 Mass. 1, 10 (2010); Commonwealth v. Garner, 59 Mass. App. Ct. 350, 366 (2003).

We likewise agree with the motion judge that the actions of police in requiring the defendant to go to the police station for questioning constituted an arrest requiring probable cause. See Commonwealth v. Melo, 472 Mass. 278, 297 (2015). We part company with the motion judge, however, in our conclusion that probable cause existed at the time the police transported the defendant to the police station for questioning. In addition to the factors recited above in support of reasonable suspicion, we add that the defendant's unprompted and inculpatory reference to the "shooting," despite the absence of any reference to a shooting by Ezekiel or any of the other officers during their initial conversation with him, and his additional agitation when Ezekiel commented on the fact that no one had said anything about a shooting, furnished ample basis to support a reasonable

_____

imputed to the other officers engaged collectively in the investigation. See, e.g., Commonwealth v. Perez, 80 Mass. App. Ct. 271, 274 (2011). Moreover, the defendant matched the description Quinonez had furnished and was at the exact location she reported having seen him just minutes earlier.

belief that the defendant was the person depicted in the video committing the robbery.

"[P]robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense." Commonwealth v. Storey, 378 Mass. 312, 321 (1979), cert. denied, 446 U.S. 955 (1980). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Commonwealth v. Cast, 407 Mass. 891, 895-896 (1990), quoting from Draper v. United States, 358 U.S. 307, 313 (1959).

The motion judge appears to have reached his conclusion that probable cause did not exist principally by discounting the force of two significant elements of the information supporting it. First, he likened the resemblance of the defendant to the general description provided in police dispatches concerning the robbery to the circumstances in Commonwealth v. Cheek, 413 Mass. 492, 496 (1992). In that case, a down jacket worn by the defendant was considered too common and generic an article of clothing to distinguish the defendant from the population at large on a cold fall night. Ibid. In the present case, by

contrast, Quinonez did not merely recognize a similarity between the defendant's otherwise common clothing and the clothing described in the broadcast dispatch; she saw the color surveillance video and was able to compare the images shown in it directly with her observations of the defendant.  Although the video did not display the robber's face (because he wore a mask during the robbery), the level of detail available to Quinonez for purposes of comparing the defendant's appearance to the person shown on the video was far greater than the information available to the police in Cheek.  See ibid.

Second, the motion judge also surmised that Ezekiel should have known that the defendant was likely to have gained knowledge that the "incident" to which Ezekiel referred involved a shooting from "news media" reports of the shooting which, the judge concluded, would likely have been broadcast beginning around 8:00 P.M.  There was no direct evidence of any such news broadcasts, much less of any exposure by the defendant to any.  The judge based his finding to that effect on Ezekiel's testimony that he saw reporters from various news outlets begin to arrive at the scene of the robbery soon after he did.  From that observation, the judge inferred that reporters would have begun broadcasting reports of the incident on radio and television, and posting reports on their respective Web sites, beginning at around 8:00 P.M.  The judge further attributed to

Ezekiel an awareness of that course of news broadcasts, so that Ezekiel, in the judge's view, should not have considered it suspicious when the defendant disclaimed involvement in a "shooting" in response to Ezekiel's reference to an "incident." To the extent that the judge found, as fact, that Ezekiel knew or should have known that news broadcasts of the incident began around 8:00 P.M., and also knew or should have known that the defendant would have been exposed to those news broadcasts by the time Ezekiel began speaking to him at 8:30 P.M., the finding rests on speculation and conjecture rather than evidence, and is clearly erroneous. In any event, even if it is possible that the defendant could before 8:30 P.M. have gained knowledge from news broadcasts that a shooting had occurred at the convenience store, Ezekiel was not compelled to adopt that view of the defendant's otherwise unprompted reference to a shooting in his assessment of its suspicious nature, particularly when the defendant's state of agitation increased when Ezekiel pointed out to the defendant that no one had said anything about a shooting.

Because the motion judge concluded that the evidence obtained during the interview of the defendant at the police station, including all statements made by the defendant, was not justified by probable cause, he suppressed that evidence, as well as evidence obtained upon execution of the search warrants

for the third-floor apartment and the defendant's backpack (as fruits of the evidence obtained during the interview).  However, because that ruling rested on the erroneous conclusion that the police were without probable cause to arrest the defendant at the time they transported him to the police station, the order allowing the motion to suppress evidence was in error and is reversed.

<u>So ordered</u>.