## COMMONWEALTH *vs.* NILTON COSTA.

Middlesex. December 4, 2006. - March 13, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.[1]

*Constitutional Law,* Search and seizure, Stop and frisk, Reasonable suspicion. *Search and Seizure,* Reasonable suspicion. *Practice, Criminal,* Motion to suppress.

A Superior Court judge erred in granting the criminal defendant's motion to suppress evidence that police had seized from him during an investigatory stop and search, where the police had an objectively reasonable suspicion that the suspect was engaged in criminal activity, based on specific and articulable facts supplied by an unidentified telephone caller who sufficiently placed her anonymity at risk when she informed police about the apparel and location of the nearby defendant, as well as her observation of a handgun he kept on his person, knowing that the police were recording the call, and aware that she was in close enough proximity to the defendant to engender concern that he might know that she had placed the call; and where the police corroborated many of the caller's details upon arriving at the scene, along with observing that the suspect appeared to be younger than the legal age to obtain a firearm license. [514-518]

INDICTMENTS found and returned in the Superior Court Department on November 7, 2002.

A pretrial motion to suppress was heard by *Leila R. Kern,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Greaney,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court. After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Karen Logee Swenson* for the defendant.

*Jessica Langsam,* Assistant District Attorney, for the Commonwealth.

CORDY, J. This case requires us to determine whether the police

[1]Justice Sosman participated in the deliberation on this case prior to her death.

had reasonable suspicion to stop and pat frisk a suspect, Nilton Costa, based on information provided in a telephone call placed to a 911 emergency operator. The telephone call was made with a cellular telephone (cell phone). The caller did not identify herself, but was aware that her call was being recorded and that the police had identified the telephone number from which she was calling, before she provided the information. The caller gave a location and full description of the clothes worn by a "teenage" suspect, reported seeing him with a handgun in his waistband in a public area where a basketball game was ongoing, and advised that she was close enough to him to be concerned that he might know that she had placed the call if she were still talking on the cell phone when the police arrived.

Following two suppression hearings,[2] a judge in the Superior Court determined that the police did not have the requisite reasonable suspicion to stop and pat frisk Costa, and allowed his motion to suppress a handgun, crack cocaine, and other items found as a result of the patfrisk and his arrest. While the judge found the caller's information sufficiently detailed for purposes of identifying the suspect, the judge relied on *Florida v. J.L.*, 529 U.S. 266 (2000), in concluding that this information alone "does not show that the tipster has knowledge of concealed criminal activity." *Id.* at 272. The judge also relied on language in *Commonwealth v. Barros*, 435 Mass. 171 (2001), that "[a]n anonymous tip that someone is carrying a gun does not, without more, constitute reasonable suspicion to conduct a stop and frisk of that individual." *Id.* at 177. On interlocutory appeal, the Appeals Court reversed, concluding that there were sufficient indicia of the caller's reliability with regard to the reported criminal activity where she had placed her anonymity at risk by providing to police the pertinent information after knowing that her call was being recorded and that the police were aware of the telephone number from which the call was

___

[2]After the first suppression hearing, the judge denied Costa's motion to suppress. Costa then filed an application for interlocutory appeal. The Commonwealth opposed the application and filed a motion to supplement the evidence that had been presented at the suppression hearing. The Commonwealth's motion was granted; Costa and the Commonwealth supplemented their evidence, and a further evidentiary hearing was held. The judge then allowed Costa's motion to suppress.

being made. *Commonwealth* v. *Costa*, 65 Mass. App. Ct. 640, 644-646 (2006). We granted Costa's application for further appellate review. We reverse the ruling of the motion judge.

1. *Background.*[3] Shortly before 7:30 P.M. on August 1, 2002, a State police emergency operator received a telephone call from a cell phone placed by an unidentified female. The State police system identified the number from which the call was placed, but not the exact location or name of the caller. The operator informed the caller that the conversation would be recorded, and the caller stated that she was at a park at Columbia and Washington Streets in Cambridge and had "just seen a kid with a gun underneath his [T]-shirt." The operator connected the caller to the 911 emergency operator for the city of Cambridge, and remained on the line. The Cambridge operator also told the caller that the call was being recorded, and the State police operator then stated, "I have a cell phone number of [telephone number], Ma'am are you still on the line?" The caller responded that she was still there and the Cambridge operator then asked her to describe the emergency. The caller gave her location and said that she was at a basketball game and had "just seen one of the teenagers lift his shirt and seen a pistol in his pants." The caller described the teenager as wearing a black shirt, dungarees with red trim, and a blue baseball hat with red trim. She informed the operator that the teenager was on the corner of Columbia and Washington Streets at that moment and said, "I just don't want to be the only one on the phone so when you all roll up there he'll know that I'm the one that called okay?"[4] When the Cambridge operator asked what type of gun she saw, the caller could not identify it and said, "I am not going to get that close,[5] it's just that obviously I seen him behind the car

---

[3]The facts are derived from the findings made by the motion judge, supplemented by additional, uncontested background details found in the record including the audio recordings admitted in evidence at the hearings on the motion to suppress.

[4]The transcript of this call reads, "I just [inaudible] so when you all roll up . . . ." This transcript was prepared from one of two separate tape recordings of the 911 conversation admitted in evidence at the suppression hearings. That tape is of poor quality. The other tape is audible on this point and contains the quoted language.

[5]This quotation also comes from the more audible of the two tape rec-

and I wanted to let somebody know." Before the operator could get any other information, the caller thanked her and the call ended.[6] The Cambridge police dispatcher transmitted the information over the police radio.

Cambridge police Officer Michael Regal heard the radio dispatch and arrived at the area within one and one-half minutes of the 911 call. Regal testified that the area surrounding the corner of Columbia and Washington Streets (known as Columbia Park area) had "always been a high crime area" where shootings had occurred and where there was a high volume of drug activity. When he arrived at the scene, Regal saw three black males standing together at the corner of the park. Two of the males appeared to be approximately twenty-five years old, and the third (Costa) looked like he was between seventeen and nineteen years old.[7] Costa was dressed in clothing that fit the description given by the caller. Regal testified that there was a basketball game in progress and that at least sixty people were in the area, including families with young children. Only Costa wore clothing that matched the caller's description.

Regal stepped out of his vehicle, approached Costa from behind, and told him not to move. He then spread Costa's arms and conducted a patfrisk. Regal first felt a cell phone, and then a hard, rough handle of what he thought might be a gun protruding from the waistband of Costa's pants. Regal removed the object. It was a .22 caliber handgun with one round in the chamber and the hammer cocked. It was quickly determined that Costa did not have a firearm identification card. He was arrested and transported to the police station in a police van. Dur-

---

ordings and not the transcript which erroneously uses the word, "specific," rather than "close."

[6]The operator had not asked for the caller's name before the telephone call ended.

[7]At the time, Costa was twenty-one years old. After observing Costa, the motion judge found that he had "a very youthful appearance" and that objectively, Costa would have appeared to both the unidentified caller and the police officer as a teenager. As Regal was aware, it is not necessarily a crime to carry a firearm, but it is illegal to do so without a license and that a person must be twenty-one years old to obtain such a license. G. L. c. 140, § 131 (d) (iv). Thus, a teenager carrying a firearm is engaging in criminal activity.

ing a subsequent inspection of the van, the police found several packages of what appeared to be crack cocaine and cash near where Costa had been seated.[8]

Costa was indicted for possession of cocaine with intent to distribute, second offense; doing so within one hundred feet of a public park; unlawful possession of a firearm, second offense; and possession of a firearm with a defaced serial number while committing a felony. Costa filed a motion to suppress the gun, the crack cocaine, and his personal effects, on the ground that they were seized in violation of his right to be secure from unreasonable search and seizure as guaranteed by art. 14 of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution.

2. *Discussion.* In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error "but conduct an independent review of [her] ultimate findings and conclusions of law." *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Scott, supra,* quoting *Commonwealth* v. *Mercado,* 422 Mass. 367, 369 (1996).

To justify a police investigatory stop under the Fourth Amendment or art. 14, the police must have "reasonable suspicion" that the person has committed, is committing, or is about to commit a crime. *Commonwealth* v. *Lyons,* 409 Mass. 16, 18-19 (1990). Reasonable suspicion must be "based on specific, articulable facts and reasonable inferences therefrom." *Id.* at 19, quoting *Commonwealth* v. *Wren,* 391 Mass. 705, 707 (1984). Information from an anonymous informant may warrant reasonable suspicion if it is shown to be reliable. *Commonwealth* v. *Alvarado,* 423 Mass. 266, 271 (1996). If "the police conduct an investigatory stop based on an informant's tip, our evaluation of the tip's indicia of reliability will be focused on the informant's reliability and his or her basis of knowledge. Independent police

---

[8]The police also recovered a wallet, a pager, and the cell phone Regal had felt during the patfrisk.

corroboration may make up for deficiencies in one or both of these factors." *Commonwealth* v. *Lyons, supra.*[9]

Costa concedes that the information provided by the caller satisfied the "basis of knowledge" prong of our customary analysis. See *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 374 (2003) (informant's recent firsthand observation satisfies basis of knowledge prong); *Commonwealth* v. *Alvarado, supra* at 271 (informant's basis of knowledge properly inferred from statement of recent firsthand observation included in call to police). We therefore turn to the reliability of its source.

When assessing the reliability of citizens who report apparent violations of the law, we accord more weight to the reliability of those who are identified. *Commonwealth* v. *Atchue*, 393 Mass. 343, 347 (1984), quoting *United States* v. *Wilson*, 479 F.2d 936, 940 (7th Cir. 1973) ("A serious charge . . . when volunteered by an identified party . . . carries with it indicia of reliability of the informant"). See *Commonwealth* v. *Burt*, 393 Mass. 703, 710 (1985) (distinction drawn "between the type of anonymous informants involved in [*Aguilar* v. *Texas*, 378 U.S. 108 (1964), and in *Spinelli* v. *United States*, 393 U.S. 410 (1969)] [i.e., professional informants] and other citizens who supply police officers with information"). *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 68 (1997) ("a tip from a private citizen is substantially strengthened when the citizen is identified by name and address"). We have also suggested that the reliability of citizen informants who are identifiable, but may not have been identified, is deserving of greater consideration than that of truly anonymous sources. *Commonwealth* v. *Vazquez*, 426 Mass. 99, 100-102 (1997) (reasonable suspicion established where bystanders pointed to defendant). *Commonwealth* v. *Stoute*, 422 Mass. 782, 791 (1996) (informant was bystander who spoke face to face to police and who "could

[9]This two-pronged review, referred to as the *Aguilar-Spinelli* test, was developed in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969). Although the Supreme Court now utilizes a "totality of the circumstances" approach to determining whether an informant's tip establishes reasonable suspicion under the Fourth Amendment, *Alabama* v. *White*, 496 U.S. 325, 328 (1990), we continue to apply the *Aguilar-Spinelli* standard to claims brought under art. 14 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Lyons*, 409 Mass. 16, 18-19 (1990).

have been identified"). See *Commonwealth* v. *White*, 44 Mass. App. Ct. 168, 172 (1998).

The rationale for according more weight to the reliability of identified persons is that they "do not have the protection from the consequences of prevarication that anonymity would afford," *Commonwealth* v. *Love*, 56 Mass. App. Ct. 229, 234 (2002), quoting *United States* v. *Lopez-Gonzalez*, 916 F.2d 1011, 1014 (5th Cir. 1990), and consequently may be subject to charges of filing false reports and risk retaliation.[10] This rationale is premised on the reasonable assumption that persons who believe they might be identified are unlikely to contact the police with impunity for the purpose of providing false information about the criminal activity of others. It applies with the same force to informants who knowingly place their anonymity at risk when they communicate information to the police, as it does to those whose identities are specifically provided. *Commonwealth* v. *Love, supra* at 234 (informant's face-to-face contact with police after alighting from vehicle whose license plate was visible to officer put anonymity at risk). *Florida* v. *J.L.*, 529 U.S. 266, 276 (2000) (Kennedy, J., concurring) ("If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip").

In this regard, it is important to recognize that citizens who report criminal activity justifiably may be concerned for their own safety if their identity becomes known to the persons subsequently investigated or arrested, and for this reason may wish to remain anonymous. This circumstance should not stand as an insurmountable impediment to a favorable assessment of their reliability in a case such as the one before us. In this respect, we agree with Justice Kennedy's observation that "a tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action." *Id.* at 275. Some of those features

---

[10]General Laws c. 269, § 13A, provides: "Whoever intentionally and knowingly makes or causes to be made a false report of a crime to police officers shall be punished by a fine of not less than one hundred nor more than five hundred dollars or by imprisonment in a jail or house of correction for not more than one year, or both."

might include "[i]nstant caller identification," "[v]oice recording of telephone tips [that might] be used by police to locate the caller," and "the ability of the police to trace the identity of anonymous telephone informants." *Id.* at 276.

By providing information to the police after knowing that her call was being recorded, and that the number she was calling from had been identified, we conclude that the caller placed her anonymity sufficiently at risk such that her reliability should have been accorded greater weight than that of an anonymous informant.[11] Although at the end of the conversation the caller appeared anxious to terminate the telephone call and did not leave her name, it is apparent from the tape recording of the conversation that she was principally concerned about the defendant (not the police) knowing her identity if she were to be observed on the cell phone.[12]

The case relied on by the motion judge, *Florida* v. *J.L.*, *supra* at 274, is distinguishable. In that case, the Supreme Court held that an anonymous tip of a person carrying a gun was insufficient to justify a police officer's stop and frisk. The anonymous caller, however, had simply informed the police that a "young black male" was standing at a specific bus stop, wearing a plaid shirt, and carrying a gun. *Id.* at 268. The caller "neither explained how he knew about the gun nor supplied any basis for believing he had inside information." *Id.* at 271. The call was not recorded and nothing was known about the caller. *Id.* at 268. Police went to the bus stop and saw three black males, one of whom was wearing a plaid shirt. *Id.* One of the officers approached the man in the plaid shirt, frisked him, and seized a gun from his pocket. *Id.* In affirming the suppression of the gun, the Supreme Court concluded that the tip failed the reliability test in its assertion of illegality, and declined to adopt a

[11]While it is possible that the caller was using a borrowed cell phone or a prepaid cell phone to which she may not have been directly traceable, she would be potentially identifiable through the owner of the cell phone. See generally *Commonwealth* v. *Love*, 56 Mass. App. Ct. 229, 233 (2002), and cases cited.

[12]The 911 operator did not ask the caller's name, nor did the caller request to remain anonymous. Contrast *Commonwealth* v. *Barros*, 435 Mass. 171, 172 n.1 (2001).

"firearm exception" to the standard stop and frisk analysis. *Id.* at 272.

The facts before us are materially different. The basis of the caller's knowledge about the gun appeared within the "tip" itself: She personally observed the handgun when standing near the defendant. Additionally, the caller described the defendant's location and dress, knowing that the police were recording her conversation and that they had identified the cell phone number from which she was calling. Finally, the police arrived on the scene (a high crime area where shootings had occurred) within minutes of the call, and were able to corroborate many of the (albeit innocent) details provided by the caller. The person identified as having the handgun was present, clearly identifiable from the description, and appeared to the police to be younger than the legal age at which a firearm license could be obtained. Consequently, the police had a reasonable basis on which to suspect that he was violating the law. Contrast *Commonwealth* v. *Barros,* 435 Mass. 171, 177 (2001) (in absence of evidence as to age or appearance of suspect believed to be carrying handgun, information that he was in possession of one did not give rise to reasonable suspicion of illegal activity).

In these circumstances, the police had an objectively reasonable suspicion that Costa was engaged in criminal activity based on specific and articulable facts. The stop and patfrisk were thus permissible under both the Fourth Amendment and art. 14, and the evidence seized admissible.

3. *Conclusion.* For the foregoing reasons, the Superior Court judge's order allowing Costa's motion to suppress is reversed.

*So ordered.*