WESLEY,-Circuit Judge,
dissenting:
I join in full Parts I and II-A of the majority opinion, but dissent as to the anonymity of the 911 caller: In light of the circumstances surrounding the police dispatch, I believe the officers reasonably relied on the call and that they had reasonable suspicion to stop Freeman.[1]
The question of “true anonymity” plays a key role in evaluating the reliability of 911 calls after Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). J.L., 529 U.S. at 275-76, 120 S.Ct. 1375 (Kennedy, J., concurring). While 911 calls were frequently recorded and 911 operators had caller ID in 2000, none of this information was in the record in J.L. Id. Noting that “[i]t is unlawful to make false reports to the police,” Justice Kennedy wrote that features that facilitate “the ability of the police to trace the identity of anonymous telephone informants” could compromise the “true anonymity” of 911 calls. Id. at 276, 120 S.Ct. 1375. However, in that case “[t]he record d[id] not show whether some notation or other documentation of the call was made either by a voice recording or tracing the call to a telephone number.” Id. at 275, 120 S.Ct. 1375. Had this information been in the record, Justice Kennedy surmised, the call might have been less “truly anonymous” and therefore more reliable.
The Majority requires the government to confirm that it could track down the tipster and hold her accountable for inaccurate tips before officers in the field can stop a crime reported in the tip. Opinion 98. Here the officers could have logically (and accurately) assumed that the 911 call was recorded. Indeed the record strongly suggests that everyone to address this case prior to the Majority’s game-changing *104 view took the police officers’ knowledge of this routine practice for granted. The calls were recorded. In fact, the record contains the calls themselves. Nevertheless, the Majority asks the government to prove that the caller knew that her call was recorded or that she could otherwise be tracked .down.[2] To prove this, the Majority would have the government hunt down the citizen tipster who accurately reported an ongoing crime while hoping to remain anonymous, merely to secure her testimony that she knew that she could be tracked down. Nothing in J.L. or any subsequent case from the Supreme Court requires'that.
The Majority further suggests that the widespread existence of cellular telephones[3] makes callers more anonymous, based on the use of cellular towers rather than land lines and the prospect of calls’ coming from disposable phones. Opinion 12. Nothing in the record or in the public domain supports this "selfserving conclusion. Indeed, other courts have held the precise opposite. See, e.g., Com. v. Costa, 448 Mass. 510, 517-18, 862 N.E.2d 371 (2007): In Costa, as here, the caller declined to leave her name when asked. Id. at 517, 862 N.E.2d 371. As here, the caller was aware of the fact that the call was recorded and her number observed. Id. The caller was on a cell phone with a line of sight on the defendant. Id. The Massachusetts high court concluded that the facts in Costa were “materially different” from J.L. Id. at 518, 862 N.E.2d 371.
Here, the police officers who made the reasonable suspicion determination were confronted with multiple recorded phone calls from' a woman who provided accurate descriptive information and a discernible call-back number[4] that yielded a voicemail message. This is not a case where a stranger in a muffled voice made a call from a payphone, or where someone dropped off an anonymous note. The officers reasonably presumed that the caller could be identified. They requested that the dispatcher call the tipster back to verify whether she actually saw a gun; the dispatcher in fact did call back on the officer’s request, albeit to no avail.[5] The *105 officers’ belief — the relevant focus in a reasonable suspicion inquiry — was that the tipster was a reachable individual, tied to a particular phone number and location.[6] “The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.” J.L., 529 U.S. at 271, 120 S.Ct. 1375.
In Copening, the Tenth Circuit distinguished the anonymous calls in that case from those in J.L., starting with the fact that, although “the caller declined to provide his name, he called 911 from an unblocked telephone number.” United States v. Copening, 506 F.3d 1241, 1247 (10th Cir.2007). The court noted that the “caller should have expected that 911 dispatch tracks incoming calls and that the originating phone number could be used to investigate the caller’s identity.” Id. The panel also noted that the caller provided very detailed information in more than one call. Id. All of these factors are present here. Furthermore, the existence of voice-mail alone belies the Majority’s assertion that this call was “as anonymous as a call placed from a public pay phone,” Opinion 10, regardless of whether the voicemail was associated with a permanent or a prepaid cellular phone.
Finally, even if the Majority were able to establish that we should analyze this case as though the caller used a prepaid cell phone, these disposable phones may not be quite as anonymous as the Majority believes. For example, as most law enforcement investigators likely know, the government can request from a cell phone company other calls made from the number of the disposable phone that was identified as the caller; the government can then ascertain the caller’s identity from the not-so-anonymous caller’s other interlocutors. “While it is possible that the caller was using a borrowed cell phone or a prepaid cell phone to which she may not have been directly traceable, she would be potentially identifiable through the owner of the cell phone.” Costa, 448 Mass. at 517 n. 11, 862 N.E.2d 371.[7] Perhaps the government would have produced information on the arresting officers’ awareness of this methodology on the record if Freeman had suggested that the tipster called (or could have called) from a disposable cell phone. He did not. This is an invention of the Majority’s imagination.
Not only does the Majority analyze reasonable suspicion as though the record supported the possibility that the caller used a prepaid cellular phone — an assumption for which the record offers no support — but it analyzes such suspicion as though the police officers in the midst of the “gun run” had reflected on the possibility that the caller was using such a phone. The Majority second-guesses the reasonable suspicions of officers who knew the sex, phone number, line of'sight, and geographical location of a caller. These officers, in the midst of a “gun run,” were informed that a woman called, twice, describing the suspect in detailed particularity and asserting that he had a firearm. The Majority’s analysis does a disservice to the officers who separated a felon from *106 his gun, to the helpful citizen who called 911 repeatedly to ensure that an explosive situation was defused, and to Fourth Amendment jurisprudence in general. The officers had more evidence than was necessary to believe that Freeman in particular was committing an ongoing crime that carried a significant likelihood of impending violence.[8] I therefore dissent.

. The Majority's strong rebuke of the government’s untenable position that even as he was detained in a “bear hug” Freeman had not been "stopped” is entirely justified. Opinion 96-97.

. Although the opinion does not articulate the links, when it asks for the government to prove that "relevant technological capacities ... enhanced reliability in th[is] particular instance,” it means that the government must demonstrate not only that the officers knew that a call was recorded, but that the caller knew. Opinion at 13. Without introducing into evidence the caller's specific knowledge that she could be tracked down, the government could not prove "whether the consequences for false reporting at all influenced this caller to tell the truth.” Opinion at 98. Presumably the most relevant inquiry would be whether the officers were informed that the caller knew that, she could be tracked down if she .lied. For obvious reasons this will be impossible to prove in every case.

. In reality, when J.L. was decided in 2000, "[wjireless subscribership in America exceed[ed] 100 million, totaling approximately 38% of the U.S. population.” CTIA, History of Wireless Communications, available at http://www.ctia.org/advocacy/research/index. cfm/AID/10392 (accessed August, 26, 2013). Admittedly, well over 300 million people now use cell phones in the United States. Id. However, it is reasonable to believe that Justice Kennedy was aware of the rising popularity of cell phones when he penned his concurrence about technology's role in decreasing "true anonymity.” J.L., 529 U.S. at 275, 120 S.Ct. 1375.

. This fact suggests that the caller did not employ a device to disguise her number, such as dialing *67 before placing a phone call.

. Although the Majority asserts that the caller "could not be reached back via phone by the 911 operator,” Opinion at 99, the record supports only the conclusion that the caller could not be reached by the police dispatcher. I find it odd that the Majority believes that the officers' repeated requests for the dispatcher to call the tipster back — a request they would not have made had they believed the tipster to *105 be unreachable — indicate that the officers believed the tipster to be unreachable. You can only call someone back if you have her number.

. Although the dispatcher did not explicitly state that she had the caller’s name, she also did not explicitly state that the caller was anonymous. The record does not reflect whether the caller’s voicemail recording contained her name.

. Given the changes in the communications industry and 911 call centers, one would hope that the Supreme Court will enter the post-J.L. world and give the circuits further guid-anee in this troubling and exceptionally important area of Fourth Amendment jurisprudence.

. ' Lists of call patterns may be used to trace the owners of prepaid cellular phones as a standard law enforcement technique. See, e.g., Joint Appendix at 192-97, United States v. Warren, - Fed.Appx. -, 2013 WL 5340407 (2d Cir.2013), ECF No. 61.