SUPERIOR COURT 
 
 SHANNON O' BRIEN v. DEBORAH GOLDBERG[1]

 
 Docket:
 2484CV03009-C
 
 
 Dates:
 June 4, 2025
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON THE MOTIONS OF DEFENDANT AND CERTAIN CURRENT AND FORMER EMPLOYEES OF THE CANNABIS CONTROL COMMISSION TO IMPOUND THE ADMINISTRATIVE RECORD
 
 

             Plaintiff Shannon O'Brien ("O'Brien" or the "Plaintiff') brought this action in the nature of certiorari under G.L. c. 249, § 4, challenging the decision of Defendant Deborah Goldberg, Treasurer and Receiver General of the Commonwealth of Massachusetts (the "Treasurer''), to remove her as Chair of the Cannabis Control Commission (the "CCC"). Before the Court are the Treasurer's Provisional Motion to Impound the Administrative Record of the underlying hearing, as we ll as several motions to impound the record brought by certain current and former CCC employees whose names appear therein (the "CCC Intervenors").[2] After a non•evidentiary hearing held on May 29, 2025, and for the reasons which follow, the motions of the Treasurer
 
--------------------------------------------
 
[1] Treasurer and Receiver General of the Commonwealth of Massachusetts, in her official capacity.
[2] Justin Shrader (Dkt. No. 35), Michael Baker (Dkt. No. 48), Nurys Camargo (Dkt. No. 49), Maryalice Curley (0kt. No. 5 I), and Christine Baily (Diet. No. 58).The CCC has also filed a memorandum in support of redacting the private information of the agency's current and former employees (Dkt. No. 61).The Court shall address all of these motions herein. The Court shall address the motion to impound filed by the remaining third-party intervenor, Edward J. Farley(Dkt. No. 56), in a separate order and decision.
 
                                                            -1-
 
and the CCC Intervenors to impound the Administrative Record shall be DENIED.
PROCEDURAL BACKGROUND [3]
            On September 14, 2023, following complaints regarding and an investigation of O'Brien's alleged misconduct, the Treasurer suspended O'Brien as Chair of the CCC, pending a decision on permanent removal. O'Brien filed an action in this Court (No. 2384CV02183) for injunctive relief, arguing that she was entitled to adequate notice of the allegations and an opportunity to defend herself against the same. This Court (Squires-Lee,  J.)  agreed  in principle, and endorsed a hearing protocol modeled on the procedures set forth by Justice Greaney in Levy v. Acting Governor of the Commonwealth. SJC -2001-0531, 0kt. No. 42 (Dec. 19, 2001). O'Brien petitioned for interlocutory review by the Single Justice of the Appeals Court, which petition was denied. O'Brien v. Goldberg. No. 2024-J-0032, slip op. (Mass. App. Ct. Feb. 6, 2024) (Hershfang, J.). O'Brien's ensuing hearing before the Treasurer's appointed officiant was held across five sessions between May 2 and June 17,2024. On September 9, 2024, the Treasurer issued her final decision, removing O 'Brien as Chairperson of the CCC.
            O'Brien then initiated the present action in the Supreme Judicial Court ("SJC") as a petition in the nature of certiorari under G.L. c. 249, § 4, challenging her dismissal from the CCC. Her SJC filing included a 1,733-page appendix of records concerning the underlying removal proceedings. The Treasurer thereupon moved to impound this appendix on the grounds that the filed documents contained personal data of CCC employees protected from public disclosure under G.L. c. 66A, § 2(c), together with other asserted claims of privilege and confidentiality.[4]  On November 14, 2024, a Single Justice of the SJC (Wolohojian, J.) transferred
 
--------------------------------------------
 
[3] The within Decision and Order sets forth the procedural history of this matter at the most general level and touches only glancingly on the contents of the Administrative Record, still nominally impounded, as necessary to resolve the present dispute and to the extent such information is already publicly available. See Ottaway Newspaper.;, Inc. v. Appeals Court, 372 Mass. 539,541 (1977).
[4] Thereafter, the CCC filed its own motion to impound the appendix asserting similar grounds for relief.
 
                                                            -2-
 
the case to this Court; and, on January 21, 2025, the undersigned ordered that O'Brien's appendix be stricken from the docket, as the Court's review of the Treasurer's decision is limited to the administrative record of the final agency action. See Dkt. No. 19 (Memo. of Decision and Order on Def.'s Emer. Mot. to Impound Pl.'s App.) Thus, it was not necessary at that time to resolve the Treasurer's substantive arguments for impounding the improvidently filed appendix. Nonetheless, inasmuch as it was apparent that similar disputes were likely to arise in connection with the eventual filing of the Administrative Record itself, the Court advised the parties as follows:
Given the nature of the underlying proceedings and the asserted bases for Plaintiff's removal as Chair of the CCC, the Court is, frankly, skeptical that the administrative record itself is likely to contain a significant amount of protected personal information that satisfies the narrow definition of same under SJC Rule 1:24. The Treasurer has not identified, and the Court has not located, any case authority suggesting that an administrative record filed in the context of a review under G.L. c. 249, § 4 or G.L. c. 30A is subject to the broader strictures of G.L. c. 66A, § 2(c), to claims of attorney-client privilege after the subject information was disclosed in an administrative proceeding, or to a private promise of confidentiality that a governmental agency may have extended to a complaining employee, such as would justify impoundment or redaction of the administrative record on those grounds.[9]
[fu.9] This is the more remarkable when one considers the fact that the government's broad construction of [the Fair Information Practices Act's] applicability to matters in civil litigation could be asserted in virtually any case in which an administrative agency is a Chapter 30A defendant. So far as the undersigned is able to discern, this case represents the first occasion when a department of the Commonwealth has pressed the expansive position on impoundment the Treasurer now does.
Id. at *5 & n.9. The Court further instructed that, to the extent the Treasurer sought to impound any portion of the then-forthcoming Administrative Record, she "must identify the specific information she seeks to withhold, and, as to each piece of information so referenced, she must cite the specific statutory or common law basis for the claim that the material is protected from public disclosure." (Id. at *6, citing Standing Order 1-96, § 2A.)
            On February 12, 2025, the Treasurer filed the Administrative Record pursuant to Superior Court Standing Order 1-96. In so doing, the Treasurer publicly filed a copy of her decision to
 
                                                            -3-
 
dismiss O'Brien from the CCC. redacting the names, titles and identifying information of all individuals other than O'Brien appearing therein (the "Redacted Decision" or "Volume f'). As to the remainder of the Administrative Record ("Volumes ll-V"), the Treasurer filed the Provisional Motion to Impound (the "Provisional Motion"), and Volumes 11-V were provisionally impounded in accordance with Standing Order 1-96[5]. Thereafter, various non-parties contacted  the Court, requesting to review Volumes 11-V of the Administrative Record. At the Court's direction, the Treasurer and/or the CCC notified all current and former CCC employees whose identifying information appears in Volumes 11-V of the pending third-party requests to review the same. The CCC Intervenors subsequently moved to intervene, which motion the Court allowed, and further moved to impound Volumes 11-V, largely adopting the arguments set forth in the Treasurer's Provisional Motion. The CCC has since filed a memorandum supporting the redaction of any personal identifying  information  contained  in  the Administrative  Record. O'Brien has opposed all of these motions.
DISCUSSION
            "Under our common law, judicial records are presumptively available to  the public." Commonwealth v. George W. Prescott Publ'g Co., LLC, 463 Mass. 258,262 (2012). This "general principle of publicity" represents the "basic premise underlying the analysis of any
request to impound public court documents." New England Internet Cafe, LLC v. Clerk of Superior Court for Criminal Bus. in Suffolk Cnty., 462 Mass. 76, 89-90 (20I2). "Impoundment is an exception to the general rule in favor of public access[.]" Prescott, 463  Mass. at  263. "The public's right of access to judicial records ... may be restricted ... only on a showing of 'good cause."' Republican Co. v. Appeals Court, 442 Mass. 218,223 (2004). Accord Trial Ct. R. VIII: Unif. R. Impoundment Proc. 7, 8. The burden of demonstrating "good cause" rests upon the
 
--------------------------------------------
 
[5] On March 18 and April 10, 2025,respectively. the parties filed joint motions to supplement the unredacted Administrative Record, which the Court allowed subject to the Treasurer's Provisional Motion to Impound.
 
                                                            -4-
 
party seeking impoundment. New England Internet Cafe. 462 Mass. at 83.
            To determine whether good cause exists, the Court "must balance the rights of the parties based on the particular facts of each case, ... and take into account all relevant factors, including, but not limited to, the nature of the parties and the controversy, the type of information and the privacy interests involved, the extent of community interest, and the reason for the request." Id., quoting Unif. R. Impoundment Proc. 7.[6] Any such order may "not exceed the need for impoundment." Unif. R. Impoundment Proc. 8(c) (court may order filing of redacted copy document for public inspection). Accord New England Internet Cafe, 462 Mass. at 83; Boston Herald, Inc. v. Sharpe. 432 Mass. 593,605 (2000). An explanation of the Court's balancing of the competing rights, interests and public policies implicated in this case follows.
I. The Public's Interests
            The SJC has"long recognized that public access to court records promotes transparency, accountability, and public confidence in our judiciary." Boston Globe Media Partners, LLC v. Chief Justice of the Trial Court, 483 Mass. 80, 92-93 (2019). This presumption of access "allows the public and the media to develop a full understanding of a judicial proceeding so that they may 'keep a watchful eye' on the judicial system." Commonwealth v. Winfield, 464 Mass. 672, 678 (2013), quoting Sharpe, 432 Mass. at 606. Were the public and its media denied access to judicial records, they "often would not have a full understanding of the proceeding and therefore would not always be in a position to serve as an effective check on the system." Boston Globe, 483 Mass. at 93 (quotations and citation omitted). As set forth in Justice Holmes's oft-invoked dictum in Cowley v. Pulsifer:
"It is desirable that [judicial proceedings] should take place under the public eye ... because it is of the highest moment that those who administer justice should always act
 
--------------------------------------------
 
[6] "The uniform rules that now govern the impoundment of records in civil proceedings incorporate many of the principles of our prior cases." Boston Herald, Inc. v. Sharpe,432 Mass. 593, 604-05 (2000) (internal quotation omitted).
 
                                                            -5-
 
under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed."
137 Mass. 392,394 (1884). See Republican Co., 442 Mass. at 222 (quoting same); Sharpe, 432 Mass. at 607 ("[The] public's understanding of and confidence in the judiciary [is] facilitated by knowing the basis on which a judge acted in a particular case.").[7]
            The public's interest magnifies in importance where, as here, the subject judicial proceedings concern the actions of public agencies and officials. "[G]reater access to information about the actions of public officers and institutions is increasingly an essential ingredient of public confidence in government." Attorney Gen. v. District Attorney for the Plymouth Dist., 484 Mass. 260,263 (2020), quoting New Bedford Standard-Times Publ. Co. v. Clerk of the Third Dist. Court of Bristol, 377 Mass. 404,417 (1979) (Abrams, J., concurring) ("New Bedford"). Access to court records "facilitates the citizen's desire to keep a watchful eye on the workings of public agencies, permits the media to publish information concerning the operation of government, ... and supports the public's right to know whether public servants are carrying out their duties in an efficient and law-abiding manner." Boston Globe, 483 Mass. at 93, quoting Sharpe, 432 Mass. at 606. See George W. Prescott Publ'g Co. v. Register of Prob. for Norfolk Cnty., 395 Mass. 274,279 (1985) ("Norfolk Cnty.") ("[T]he public has a vital interest in full disclosure of all information which is relevant to [a public official's] alleged misuse of authority."). Indeed, where records concern allegations of a public official's misconduct in office, the "good cause" standard requires "a showing of overriding necessity" to impound the materials. Norfolk Cnty.• 395 Mass. at 282 (emphasis added); Globe Newspaper Co. v. Clerk of
 
--------------------------------------------
 
[7] Reinforcing the presumption of openness to the public in the context of an administrative appeal, it bears note that the administrative record "essentially serve[s] asa substitute for ... testimony in open court." Shame.432 Mass. 593,607 (2000). The Constitution, of course, commands that certain court proceedings be conducted in public. See Commonwealth v. Pon, 469 Mass. 269,309-10(2014) (proceedings are presumptively public under First Amendment if they have "historically been open to press and general public" and "public access plays a significant positive role in the functioning of the particular process"), citing Press-Enterprise Co. v. Superior Court, 478 U.S. I, 8 (1986).
 
                                                            -6-
 
Suffolk Cnty. Superior Court, No. 01-5588-F, 2002 WL 202464, at *4 (Mass. Super. Ct. Feb. 4, 2002) (Gants, J.).
            Here, it cannot be gainsaid that the administration of the CCC is a matter of acute public interest and concern. The agency was established in December, 2016 pursuant to the public's approval of a ballot measure legalizing the production, distribution and adult recreational use of marijuana. See St. 2016, c. 334,§§ l , 5, 76(a)(Dec. 15, 2016), codified as G.L. c. 10, § 76{a), G.L. c. 94G, § 4. The agency is tasked with overseeing the licensing, regulation and taxation of the newly legalized cannabis market. Id. Notably, within a year of establishing the CCC, the Legislature amended its governing statute, and thereby expanded the agency's administrative apparatus from three commissioners to five, and divested the Treasurer of certain powers of appointment and removal. See G.L. c. 10, § 76(a)[8]. As Chair, O'Brien was charged with exercising supervisory control "over all the affairs" of the CCC, presiding at CCC hearings, and dividing work among the commissioners. G.L. c. 10, § 76(h). O'Brien's prescribed job portfolio represents important matters of public interest all.
The Treasurer, in turn , is a statewide elected official. And this litigation concerns her decision to remove O' Brien - herself, a former Treasurer of the Commonwealth (1999-2003) and the 2002 Democratic Party nominee for Governor - as Chair of the CCC  based on findings that O' Brien had committed gross misconduct and was unable to discharge her duties to the agency. The Administrative Record reflects the entire evidentiary basis for both the Treasurer's decision and the Court's review of same. In accordance with the foregoing principles and precedents, the
 
--------------------------------------------
 
[8] As initially constituted, the CCC consisted of a commissioner and two associate commissioners, each appointed and subject to removal by the Treasurer "for neglect of duty, misconduct or malfeasance in office[.)" St. 2016, c. 334,§ 76(d). The 2017amendments to the statute expanded the CCC to five commissioners, with a Chair appointed by the Treasurer, one commissioner appointed by the Governor, one commissioner appointed by the Attorney General, and two commissioners appointed by majority vote of the Governor, Treasurer and Attorney General (the appointing authorities).G.L. c. l0, § 76(a). Each commissioner is now subject to removal by his/her respective appointing authority, but only if the commissioner (I) is guilty of malfeasance in office; (ii)substantially neglects his/her duties;(iii) is unable to discharge the powers and duties of the office; (iv) commits gross misconduct; or (v) is convicted of a felony. G.L. c. 10, § 76(d).
 
                                                            -7-
 
public's interest in access to the documents comprising this record is exceedingly high.
II. O'Brien's Interests
            The Treasurer has provided O'Brien with an unredacted copy of the Administrative Record, and there is no dispute that O'Brien is herself entitled to the same. Nonetheless, the Treasurer and CCC Intervenors seek to impound (and thereby thwart public access to) the remaining portions of this Administrative Record. 0 'Brien opposes the redaction of Volume I and the impoundment of Volumes II-V, asserting a right to publish the documents and pursue a "name-clearing hearing."
            O'Brien initiated the present action to contest the legal and evidentiary basis for her dismissal. Notably, in filing the Administrative Record, the Treasurer did not seek to impound her decision (and the underlying reasoning thereof) for discharging O'Brien from the CCC -apart from redacting the names and identifying information of other agency personnel. (See Volume I.) O'Brien contends, therefore, that impoundment of the remainder of the Administrative Record would unfairly limit the public's understanding of the basis for her dismissal to the Treasurer's [selective and skewed] interpretation of the evidence, a limitation denying her the ability to present, and the public the ability to examine, the unfiltered record in order to reach independent conclusions.
            O'Brien's contention clearly carries force. Public access to the underlying evidence in this case may well serve as an effective antidote to reputational harm. Indeed, the public name- clearing O'Brien seeks in this action would be substantially illusory were the Court to impound the relevant records in the expansive manner urged by the Treasurer and CCC Intervenors. Likewise, public access to the full Administrative Record promotes O'Brien's interests in fair legal proceedings, both administrative and judicial. Open proceedings encourage "all [] participants to perform their duties more conscientiously," Gannett Co. v. DePasguale. 443 U.S.
 
                                                            -8-
 
368, 383 (1979), and "assure ... that procedural rights are respected, and that justice is afforded equally." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555,.593 (1980) (Brennan, J., concurring). "Secrecy is profoundly inimical to this demonstrative purpose[.]" Id. As such, "the right to a public trial is one of the means devised to ensure the right to a fair trial, and the public often needs access to the court papers to determine whether a trial has been conducted fairly." Globe Newspaper, 2002 WL 202464, at *2 (emphasis in original).
            To be sure, one cannot evaluate and challenge the soundness of a judicial or quasi- judicial decision without the ability to inspect the factual foundation on which it relies. To permit the Treasurer, on a selective basis, to shield evidentiary elements of her decision-making from the sunlight of public scrutiny is, therefore, to deny O'Brien the most fundamental feature of fairness. These asserted interests largely echo, and are essentially mirror images to, the public interests expounded ante. See Boston Globe, 483 Mass. at 93 (public would not have full understanding of proceedings, and would not always serve as effective check on same, if it were denied access to judicial records); Winfield, 464 Mass. at 678 (access allows public; and media to develop full understanding of legal proceedings). For this reason, O'Brien's interest in public access to the complete Administrative Record in this case stands on a moral ground no less high than the public's own compelling interest in such access.[9]
III. Competing Interests of the Treasurer, the CCC and the CCC Intervenors
 
--------------------------------------------
 
[9] Plaintiff also invokes Fir.;t Amendment and due process rights to publication of the Administrative Record, but expends little ink to develop these arguments in her briefing. Inasmuch as the constitutional presumption of access mirrors that of the common law (See Pon. Supra at n.7) and the undersigned here determines, applying the Uniform Rules of Impoundment Procedure and applicable precedent, that the Treasurer is not entitled to the impoundment she seeks, see infra. the Court need not address separately Plaintiff's passing claims of constitutional protection. It does bear note, however, that this Court held previously that Plaintiff did not have a due process right to a public hearing before the agency. See O'Brien v. Goldberg. No. 2384CV02 l 83, slip op. at • 11 (Dec. 22, 2023) (Squires-Lee, J.). The Court will decide the merits of Plaintiffs certiorari petition following briefing and a public hearing. The cases Plaintiff relies upon to assert a broader constitutional right to "name clearing" do nol hold that more is required, and are in all events not binding on this Court. See Gunasekem v. Irwin. 55 l F.3d 461, 471 (6thCir.2009); Patterson v. City of Utica, 370 F.3d 322,336 (2d Cir. 2004).
                                                            -9-
 
            The Treasurer has argued and the CCC Intervenors maintain that the Treasurer's Decision must remain redacted, and that Volumes II-V must be impounded for the duration of this litigation, because they contain confidential personnel data and records protected from-disclosure under the Fair Information Practices Act (the "FIPA"), G.L. c. 66A.[10] The Court does not agree.
            While the Legislature "may modify or abrogate common law practices regarding public access to judicial records," its intent to do so must be clear. Commonwealth v. J.F.• 491 Mass. 824, 837 (2023} (quotation omitted). See Chelsea Hous. Auth. v. McLaughlin. 482 Mass. 579, 590 (2019) ("statute is not to be interpreted as effecting a material change in or a repeal of the common law unless the intent to do so is clearly expressed" [quotation omitted]). Nothing in the FIPA remotely suggests such an intent. By its plain terms. the FIPA does not apply to court records or judicial proceedings. New Bedford. 377 Mass. at 407. The statute places certain responsibilities on a "holder" that maintains "personal data." Id.• quoting G.L. c. 66A, § 1. "Holder," however, is defined in terms of an "[a]gency," and "agency" is limited to "the executive branch of the government." New Bedford, 377 Mass. at 407, quoting G.L. c. 66A, § 1. The related public records laws, G.L. c. 66,§ 10 and G.L. c. 4, § 7(26), likewise do not apply to court records. See New Bedford, 377 Mass. at 407, citing Ottaway Newspapers, Inc. v. Appeals
Court, 372 Mass. 539, 545-46 (1977).[11]
            Here, the Treasurer was required to file in court the Administrative Record as her answer
 
--------------------------------------------
 
[10] The verb tense used to characterize the Treasurer's position is advised. The Treasurer's Provisional Motion requested that "the unredacted administrative record be impounded during the pendency of the case including any appeal[,)" and included a proposed order to that effect. (Dkt. No. 20, at p. 3 & attachment.) The CCC Intervenors adopted the Treasurer's Provisional Motion, interpreting it, as the Court did, as a request for ongoing impoundment. At oral argument, however, the Treasurer abjured the language in her Provisional Motion and now contends that she sought only to ensure that the third-party data subjects of potentially FIPA-protected information  had  an  opportunity to be heard prior to publication of the Administrative Record. Such notice and opportunity having now been given, and despite prior assertions to the Court that the Administrative Record contains FIPA-protected information, the Treasurer now professes to take no position as to whether this record should be impounded or whether the statute requires such action.
[11] The FIPA defines"personal data" as "any information concerning an individual which, because of name, identifying number. mark or description can be readily associated with a particular individual; provided, however, that such information is not contained in a public record, as defined in [G.L.c. 4. § 7(26)] . . . “ G.L. c. 66A,§ 1.
 
                                                            -10-
 
to Plaintiff's petition. See Super. Ct. Standing Order 1-96; G.L. c. 30A, § 14(4). Once filed, the Administrative Record became a judicial record beyond the reach of the FIPA and public records laws applicable solely to the executive branch. See New England Internet Cafe, 462 Mass. at 89- 90; Ottaway Newspapers, 372 Mass. at 545-46. The Treasurer and the CCC Intervenors have cited no language in the FIPA to suggest an intent to abrogate the common law presumption of public access to judicial records, or to preclude public access to an administrative record once filed in the context of an administrative appeal under G.L. c. 30A or G.L. c. 249, § 4. Further- and despite the Court expressly calling out this deficiency in its prior order - the proponents of impoundment have failed to cite a single case (in the five decades since the FIPA was enacted) in which a court has held, or a party has even argued, that G.L. c. 66A applies to judicial review of an administrative record. The moving parties' inability to identify any caselaw supporting their argument - and the undersigned's independent research revealing none - leads to the inescapable conclusion that no agency or court has ever adopted the expansive reading of the FIPA they now urge.
            The implications of the Treasurer's and CCC Intervenors' requests for impoundment are striking. As the Treasurer has acknowledged, the requirements the FIPA imposes on agencies are "inflexible and strict." Dkt. No. 11 (Def.'s Reply Mot. Impound App., at p. 1.) See G.L. c. 66A, § 2. To embrace the moving parties· position would require the Court to conclude that executive agencies of the Commonwealth have failed to uphold their FIPA obligations in untold numbers of administrative appeals over the past 50 years and, further, that no one has ever noticed. The Court declines to take such an extraordinary leap over common sense, untethered as it would be to our laws and historical  practices.[12]  Instead, the Court joins the unanimous consensus of the past half-century in concluding that, by its plain terms, G.L. c. 66A does not apply to records
 
--------------------------------------------
 
[12] The Treasurer's game-day renouncement of any argument for further impoundment based on the FIPA suggests a similarly negative assessment of the ongoing merit of such a claim.
 
                                                            -11-
 
filed with a court in the context of an administrative appeal, and this statute thus does not require impoundment of the same.
            The Treasurer and CCC Intervenors have likewise failed to demonstrate that any of the purposes of G.L. c. 66Agive rise to an "overriding necessity" to impound or redact this case's Administrative Record. To be sure, our courts have recognized circumstances in which a statute, although "not calling by explicit language for [] impoundment of [a] court record, d[oes] so by implication or analogy." Ottaway Newspapers, 372 Mass. at 546. In such instances, good cause may exist to impound agency records to prevent "a distortion and frustration of the legislative purpose." Id. But that is simply not the case here.
            The Treasurer has invoked G.L. c. 4, § 7, 26(c), which exempts from ''public records" (and thereby triggers an agency's FIPA obligation to protect) "personnel and medical files or information and any other materials or data relating to a specifically named individual, the disclosure. of which may constitute an unwarranted invasion of personal privacy . . . "However, the only "personnel" infonnation[13] that appears to be at issue in the case at bar is O'Brien's, whose actions and purported misconduct were the subject of the underlying proceeding. O'Brien herself has obviously placed those matters in issue through the present litigation, and she opposes impoundment and redaction. The unmistakable purpose of G.L. c. 66A and G.L. c. 4, § 7, 26(c) is to preclude unwarranted third-party inquiries into, or employer disclosures of, an employee's medical information, disciplinary history, intimate personal details, and the like without that employee's consent. See Boston Globe Media Partners. LLC v. Department of Pub. Health, 482 Mass. 427, 439-40 (2019); Wakefield Tchrs. Ass'n v. School Comm. of Wakefield.
 
--------------------------------------------
 
[13] The SJC has noted that "the precise contours of the legislative term 'personnel [file] or information' may require case-by-case articulation, [but] it includes, at a minimum, employment applications, employee work evaluations, disciplinary documentation, and promotion, demotion, termination information pertaining to a particular employee." Wakefield Tchrs. Ass'n v. School Comm. of Wakefield, 431 Mass. 792,798 (2000).
 
                                                            -12-
 
43 l Mass. 792, 798 (2000). Nothing in the statute reflects an intent to preclude an employee from publicizing her own personnel information or challenging her employer's disciplinary decision in an open court proceeding; and nothing in either the statutory text or the logic animating it suggests that the purposes of our Public Records Law would be frustrated if an employee elected to do so. The Treasurer has effectively conceded as much by publicly filing her written decision to dismiss O'Brien from the CCC (Volume I).
            As to the other individuals whose information appears in the Administrative Record, the Treasurer and CCC Intervenors have failed to demonstrate how public access would so distort or frustrate the FIPA as to create an overriding necessity for impoundment. Indeed, despite the Court's prior directive, the Treasurer's Provisional Motion fails to identify "the specific [protected] information" that requires redaction beyond SJC Rule l :24,[14] much less impoundment of the nearly 3,000-page Administrative Record. There is no suggestion that the documents at issue disclose the identities of juveniles or victims of criminal conduct, concern targeted sexual harassment or discrimination, or reveal private medical information, matters of sexual orientation, intimate relationships or other highly personal details such as might establish an overriding need for redaction. Compare, . Ottaway Newspapers, 372 Mass. at 546 *& n.9 (referencing statutes limiting access to court proceedings and official records); Arroyo v. Boston, No. 2284CV1997-C, slip op. at *9 (Mass. Super. Sept. 1, 2022) (Squires-Lee, J.) (noting "various [legislative] measures" and "grave public interests in protecting the victims of sexual assault"); M.G. v. Department of Children & Families. No. 1883CV00718, 2018 Mass. Super. LEXIS 2811, at *1 (Nov. 30, 2018) (Conolly, J.) (impounding administrative record that
 
--------------------------------------------
 
[14] SJC Rule I:24 provides for the redaction of"[p]ersonal identifying information," which the Rule defines as "a social security number, taxpayer identification number, driver's license number, state-issued identification card number, or passport number, a parent's birth surname if identified as such, a financial account number, or a credit or debit card number." The Treasurer and CCC Intervenors have not specifically cited to any such information appearing in the Administrative Record (save for O'Brien's own social security number, which shall be redacted).
 
                                                            -13-
 
contained "sensitive medical and personal information concerning the [p]laintiffs' minor children"). ·
            All that the Treasurer and CCC Intervenors have indicated in their court filings is that the Administrative Record reveals their names, titles and interactions with colleagues related to O'Brien's dismissal. The revelation of such information does not, without much more, plausibly constitute either an "unwarranted invasion of personal privacy," see G.L. c. 4, § 7, 26(c), or good cause for redaction.
            To be sure, individuals do not wholly sacrifice reasonable expectations of privacy in their working lives when they enter into the employ of the state. Wakefield Tchr'S. Ass 'n . 431 Mass. at 802. The government could not function effectively as an employer were that the case. Id. The key question posed by the movants' argument thus asks whether "the information sought to be impounded, if revealed in public court records, would invade the legitimate expectation of privacy that ... persons have in matters that are intensely personal and private." Globe Newspaper, 2002 WL 202464, at *5, citing Sharpe, 432 Mass. at 612. ''[A] public official has a significantly diminished privacy interest with respect to information relevant to the conduct of his office;" and ''when the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy." Norfolk Cnty., 395 Mass. at 278 (refusing to impound private information in divorce case where husband was the County Treasurer and Chairman of the County Retirement Board). "This is particularly true, at least with respect to the propriety of an order of impoundment, where. as here, there has already been extensive media coverage of the individuals and events at issue." Id. at 278-79. See Boston Globe, 482 Mass. at 440 (holding that, even in the context of a public records request, whether "information is intimate and highly personal is one of many possible factors to consider," as well as the "public employee's diminished expectations of privacy," and "the requested information's availability from other
 
                                                            -14-
 
sources").
            The relevant interactions between O'Brien and other CCC commissioners and personnel are extensively summarized in the Treasurer's 80-page dismissal decision (Volume I), which is already public. While the Treasurer redacted the names, titles and other identifying information of the individuals referenced therein (except for  O'Brien), it will be  obvious to any sentient reader that these individuals were other CCC commissioners and administrative staff. These persons comprise a finite group of public-facing officials whose names, titles and; as to the commissioners, qualifications and experience, are already publicly posted on the CCC's website. See "Commission and Leadership Team," available at https://masscannabiscontrol.com/about/ commission-leadership-team/. The meetings of the CCC commissioners - the setting of at least a portion of O'Brien's alleged misconduct - are likewise conducted in public pursuant to the Open Meeting Law, G.L. c. 30A, § 20, and are apparently broadcasted, recorded, archived and publicly available on the CCC's website. See "Public Meeting Materials," available at https://mass cannabiscontrol.com/public-documents/public-meetings/. CCC officials can have no legitimate expectation of privacy in every record in which their names and titles appear. See Brogan v. School Comm. of Westport, 401 Mass. 306,308 (1987) (names of committee's employees, and the dates and generic classifications of their absences, held subject to public records request); Hastings & Sons Publishing Co. v. City Treasurer of Lynn. 374 Mass. 812, 818 (1978) ("The names and salaries of municipal employees ... are not the kind of private facts that the Legislature intended to exempt from mandatory disclosure.") Nor can the Treasurer and CCC Intervenors plausibly assert such an expectation as to the Administrative Record, when their names, titles and "many of the facts and allegations contained [therein] are already in the public domain[.]" Globe Newspaper Co. v. Doe, No. 003790, 2000 WL 33171055, at *5 (Mass. Super. Ct. Dec. 4, 2000) (Gershengom, J.). Lastly, the fact that the CCC personnel identified in the
 
                                                            -15-
 
Administrative Record are third-parties to this action and its underlying proceeding does not alter the outcome. "If the third-party [] is a subject of legitimate public scrutiny, and if the [information] is relevant, in any way, to allegations of misconduct in office, only a showing of overriding necessity will justify its [ ] impoundment." Norfolk Cnty., 395 Mass. at 282. The Treasurer and CCC Intervenors have failed to clear this high necessity threshold to warrant either the impoundment of Volumes 11-V or the redaction of their names and titles from Volume I. 
            The Court reaches the same conclusion as to  the discrete objections raised by certain CCC Intervenors. First, one CCC Intervenor argues that the disclosure of his/her personal identifying information will cause him/her "to suffer reputational harm and potential retaliation by [being] publicly associated with the investigation of [ ] 0 'Brien," and that such disclosure "would have a substantial chilling effect on future investigations, as state employees will be unwilling to cooperate if their [promised] anonymity is not consistently and universally maintained."[15] As noted ante, there is no indication that this dispute concerns victims of criminal conduct or the subject of intimate matters as to which the law recognizes a legitimate expectation of privacy. While circumstances warranting whistle blower anonymity undoubtedly exist, legal counsel investigating acts of a public official do not possess authority to grant anonymity to witnesses and the Court is not bound by any ill-considered assurances of same. See Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court, 448 Mass. 15, 30 (2006) ("The public interest in seeing legislative policies adhered to by a governmental agency" generally overrides individual promises of a government official to the contrary); Sharpe, 432 Mass. at 608 (same). See id. at 612 ("Impoundment of judicial records is not warranted simply because the parties
 
--------------------------------------------
 
[15] The CCC's memorandum raises similar arguments regarding the purported need to preserve the anonymity of witnesses and uphold the agency·sand/or its investigators·private promises of confidentiality.
 
                                                            -16-
 
elect to keep certain information shielded from public view.").[16] Regardless, there is no indication here that the identity of an anonymous witness is actually revealed in the Administrative Record. To the contrary, the Treasurer's decision notes explicitly that the identities of these individuals was not disclosed during the proceedings before her. (See A.R., Vol. I, at p.75.) Furthermore, to the extent Volumes11-V do identify such individuals, O'Brien herself already possesses that information. Thus, even assuming arguendo that O'Brien prevails on the merits, returns to a position in which she could engage in feared retribution, and the various statutory prohibitions against retaliation by agencies are not a sufficient deterrent, redacting or impounding portions of the Administrative Record from the public's view has no impact. See Pixley v. Commonwealth, 453 Mass. 827, 836 n.12 (2009) ("[I]mpoundment prevents the public, but not the parties, from gaining access to impounded material[.]").
            This CCC Intervenor does make a  fair point that those who might participate productively in internal investigations of wrongdoing might in the future be deterred from doing so if they cannot be assured of confidentiality. 17 Perhaps. But an equally valid postulate is that those who might be prepared to engage in false or speculative accusation will be more hesitant to do so if they know that their accusations may one day face public scrutiny. Thus, while the public may benefit from a freer flow of information to those who investigate wrongdoing in
 
--------------------------------------------
 
[16] Intervenors' counsel at hearing conceded that they were aware of no legal authority investing administrative agency executives and/or their lawyers with the power to confer a grant of anonymity and confidentiality on cooperating witnesses such as would withstand the force of a subpoena or court order in a future legal proceeding.
[17]But the CCC's reliance on Antell v. Attorney Gen.,52 Mass. App.Ct. 244, 248 (2001), for the proposition that "redaction may be appropriate to preserve the anonymity of voluntary witnesses," see Dkt. No. 61, at p. 3, is misplaced. Antell concerned a local police chiefs public records request for the Attorney General's file of an investigation into the chief for criminal misconduct. 52 Mass. App.Ct. at 245.The Appeals Court held that redaction of the names of voluntary witnesses might be warranted under the law enforcement investigatory materials exemption of the law, G.L. c. 4, § 7, 26(1), see id at 248,a provision with no application to outside counsel's investigation of O'Brien. Moreover, the investigation in Antell was closed without the Attorney General pursuing any criminal charges. In stark contrast, the Treasurer's counsel entered the investigators' reports and testimony (including the anonymous witness statements) into the Administrative Record below. It is a well-established principle of law that the security of anonymity and other privileges extended at the investigatory and accusatory phases of a legal process must generally yield when the merits of those accusations are adjudicated. Ottaway Newspapers, 372 Mass.at 548-49.
 
                                                            -17-
 
government (an information flow that confidentiality facilitates), it is no less true that the quality of such investigation is enhanced when the information conveyed carries greater assurances of trustworthiness and reliability because those who supplied it knew their accusations would not remain anonymous. See Commonwealth v. Costa, 448 Mass. 510,516 (2007) (law accords greater weight to the reliability of identified persons because such persons "do not have the protection from the consequences of prevarication that anonymity would afford" [quotation omitted]). Once again, therefore, and given this wash, the countervailing interests of the accused (not falling victim to star-chamber justice) and the public (a right to know the full facts regarding how the leaders of their government are performing and failing to perform) predominate.
            A second Intervenor objects to a one-line statement that O'Brien presented in support of her complaint for injunctive relief (No. 2384CV02183), in which O'Brien referred to this Intervenor by title and implied that his/her departure from the CCC was not by mutual agreement. In the injunctive relief proceedings, O'Brien then submitted a revised affidavit which omitted the line at issue. The original statement was included within Volumes II-V, but with the Intervenor's title redacted. Thus, as it pertains to the Administrative Record, it does not appear that the Intervenor's identifying information is tied to the purportedly misleading statement concerning the circumstances surrounding his/her departure. Under these circumstances, the Court does not find good cause for further redaction of either the cited material or similar references that may appear with the Administrative Record. "The mere potential for 'embarrassment' or the fear of 'unjustified adverse publicity' is not sufficient to show good cause." Globe Newspaper, 2002 WL 202464, at *5, quoting Norfolk Cnty., 395 Mass. at 279. It is common knowledge that not every assertion raised in the context of an adversarial proceeding proves to be factually accurate, and the Uniform Rules of Impoundment Procedure do not exist for the Court to render such judgments. Given what little appears to remain in the Administrative
 
                                                            -18-
 
Record from O'Brien's oblique reference to the Intervenor, and O'Brien's clear retreat from the subject statement, the Court does not find that the need for further redaction overrides the "rigorous presumption of openness" in favor of public access. Sharpe, 432 Mass. at 608.
            Finally, a CCC Intervenor objects to references in the Administrative Record that he/she had taken family medical leave. The fact that an individual has taken such leave is not, standing alone, protected information under either our public records laws, or the Federal or Massachusetts Family and Medical Leave Acts. See Brogan, 401 Mass. 306, 308 (1987) ("dates and generic classifications" of employee's absences not protected from public disclosure); G.L. c. 175M, § 5(b) (requiring confidentiality of "medical and health information" required to justify leave). Accord 29 Code Fed. Regs.§ 825.500(g). The moving parties have not demonstrated or even suggested that such references reveal confidential medical information, "the details of family emergencies," Brogan. 401 Mass. at 306, or other intensely personal matters warranting impoundment or redaction. See Globe Newspaper, 2002 WL 202464, at *5.
CONCLUSION AND ORDER
            Applying the multi-interest balancing that the law requires, the Court concludes that the Treasurer, the CCC, and the CCC Intervenors have not demonstrated the good cause necessary to justify either impoundment or further redaction of the Administrative Record. The countervailing interests of both. O'Brien and the broader public in unrestricted access to the documentary evidence bearing on this government agency's dismissal of its Chairperson (see ante) overwhelmingly tip the scale, and must be respected.
            For the foregoing reasons, the Motions to Impound the Administrative Record of the Defendant, Deborah Goldberg, Treasurer and Receiver General of the Commonwealth of Massachusetts (Dkt. No. 20), the Cannabis Control Commission (Dkt. No. 61) and the current and former personnel of the Cannabis Control Commission (Diet. Nos. 35, 48. 49, 51 and 58)
 
                                                            -19-
 
shall be, and hereby are, DENIED. The provisional impoundment of Volumes II through V of the Administrative Record pursuant to Standing Order 1-96 shall be, and hereby is, VACATED. The provisional impoundment of the FTR recording of the May 29, 2025 hearing, except as it pertains to Intervenor Farley, shall be, and hereby is, also VACATED. The Treasurer shall have one week from the effective date of this Decision and Order to file a copy of Volumes I through V of the Administrative Record with the Court, subject only to the redaction of O'Brien's social security number and other personnel identifying information as defined under SJC Rule I:24.
            The terms of the foregoing Order shall be STAYED for 20 days. Such stay shall be extended for a total period not to exceed 60 days, per Mass. R. App. P. 4(a), if within such 20- day window an aggrieved party files notice of an intent to take an interlocutory appeal from the ruling.
SO ORDERED.